```
 1                   UNITED STATES DISTRICT COURT

 2                             FOR THE

 3                   DISTRICT OF SOUTH CAROLINA

 4                      SPARTANBURG DIVISION

 5    * * * * * * * * * * * * * * *
      UNITED STATES OF AMERICA,   * CRIMINAL NO. 7:22-cr-00780
 6                                * JUNE 13, 2023 12:01 P.M.
                       Plaintiff,  * MOTION TO SUPPRESS HEARING
 7                                *
      vs.                         *
 8                                *
      STEPHEN DAN SANTIS and      * Before:
 9    CALVIN LADELL HUDGENS,      * HONORABLE DONALD C. COGGINS, JR.
                                  * UNITED STATES DISTRICT JUDGE
10                  Defendants.   * DISTRICT OF SOUTH CAROLINA
      * * * * * * * * * * * * * * *
11    APPEARANCES:

12    For the Plaintiff:      KRISTEN ANN BALES, AUSA
                              BENJAMIN GARNER, AUSA
13                            United States Attorneys Office
                              1441 Main Street, Suite 500
14                            Columbia, SC  29201

15    For Defendant Stephen Dan Santis:

16                            JUDEA SHECHINAH DAVIS, ESQUIRE
                              LORA COLLINS BLANCHARD, ESQUIRE
17                            Federal Public Defenders Office
                              75 Beattie Place, Suite 900
18                            Greenville, SC  29601

19    For Defendant Calvin Ladell Hudgens:

20                            ANDREW T. POTTER, ESQUIRE
                              Potter Law, LLC
21                            500 E. Calhoun Street
                              Anderson, SC  29621

22    Court Reporter:        Michele E. Becker, RMR, CRR, RPR
23                            201 Magnolia Street
                              Spartanburg, SC  29306
24                            (864) 905-8888

25
```

1                    EXAMINATION INDEX

2                                                        Page

3   Direct Examination by the Plaintiff (Ms. Bales)      06

4   Cross Examination by the Defendant (Ms. Davis)       21

5   Argument by the Plaintiff (Ms. Bales)                62

6   Argument by the Defense (Ms. Davis)                  71

7   Further Argument by the Plaintiff (Ms. Bales)        80

8   Further Argument by the Defense (Ms. Davis)          83

9                     **E X H I B I T S**

10  Dft. Exh. No. 1 D.E.A. Report......................... 33

11  Dft. Exh. No. 2 Union County Report April 22, 2022..... 33

12  Dft. Exh. No. 3 Union County Report June 2, 2022....... 33

13  Dft. Exh. No. 4 Laurens County Report March 31, 2022... 33

14  Dft. Exh. No. 5 Photo of Seized Methamphetamine........ 33

15  Dft. Exh. No. 6 Voluntary Statement of CI 4/1/2022..... 33

16  Dft. Exh. No. 7 Voluntary Statement of Santis 4/1/2022. 33

17  Dft. Exh. No. 9 Body-worn Video 1 of Vinson............ 33

18  Dft. Exh. No. 10 Body-worn Video 2 of Vinson........... 33

19  Dft. Exh. No. 11 Audio of Body-worn device worn by CI

20  3/31/2022.............................................. 33

21  Dft. Exh. No. 12 Text Messages 3/31/2022............... 33

22  Dft. Exh. No. 13 Union Co. Body-worn Camera Policy and

23  Procedure.............................................. 33

24  Dft. Exh. No. 14 Union Co. CI Policy and Procedure..... 33

25  (Whereupon, Dft. Exh. No. 8 is not admitted.)

1                    P R O C E E D I N G S

2    (Court convened at 12:01 p.m.)

3            **THE COURT:**  All right.  Ms. Bales, I'll have you

4    call the case and then Ms. Davis, since it's your motion,

5    we'll come to you.

6            **MS. DAVIS:**  Yes, Your Honor.

7            **THE COURT:**  Ms. Bales.

8            **MS. BALES:**  Thank you, Your Honor.  The United

9    States of America versus Stephen Dan Santis.  This is criminal

10   Case No. 7:22-cr-00780.  We are before Your Honor on Defense's

11   Motion to Suppress.

12           **THE COURT:**  All right.  Thank you.

13           Ms. Davis, you ready to go forward today?

14           **MS. DAVIS:**  Yes, Your Honor.

15           **THE COURT:**  All right.  And Mr. Potter.

16           **MR. POTTER:**  May it please the Court.

17           Judge, I've had an opportunity to talk to my client.

18   In light of the conversations at the pretrial conference

19   yesterday afternoon, we're going to go ahead and withdraw our

20   motion in limine in regards to identifications made by the

21   co-defendant without prejudice at this time, in light of the

22   fact that the government has consented to our motion in limine

23   related to the confidential source.

24           **THE COURT:**  Okay.

25           **MR. POTTER:**  So I think that will save a lot of

1   time, Judge, and it does not necessarily require us to remain

2   for the motion hearing in regards to Mr. Santis.

3           **THE COURT:**  All right.  So does that take care of

4   your issues?

5           **MR. POTTER:**  I believe it does, Judge.  Just as long

6   as we're on the record in regards to the government's position

7   on the motion for the confidential source.

8           **THE COURT:**  All right.  Ms. Bales, can I get you to

9   confirm that for the record?

10          **MS. BALES:**  Certainly, Your Honor.  As to the

11  identification made by the confidential source in this case,

12  the government concedes as to the identification, pretrial

13  identification, as well as at trial identification.

14          **THE COURT:**  All right.  So based upon that, given

15  the fact that the government is conceding the point with

16  regard to the identification by the CI, the government will be

17  precluded from making use of that information at trial.

18          And Mr. Potter, my understanding is then conversely,

19  you're going to withdraw your motion as to the co-defendant?

20          **MR. POTTER:**  At this time without prejudice.

21          **THE COURT:**  At this time without prejudice.

22          **MR. POTTER:**  Yes, Your Honor.

23          **THE COURT:**  All right.  Well, I think you are

24  correct.  I think that takes care of Mr. Hudgens.

25          **MR. POTTER:**  Yes, sir.

1    **THE COURT:**  And at this time we'll take just a few
2  moments.  And I don't think he needs to stick around and
3  neither do you.
4    **MR. POTTER:**  I may watch a little bit of the
5  fireworks, Judge, if it pleases the Court.
6    **THE COURT:**  You can do whatever you want.  All
7  right.  That will be fine.
8    **MR. POTTER:**  Thank you, Judge.
9    **THE COURT:**  All right.  And I'll ask the Marshals if
10  they can remove Mr. Hudgens since he doesn't need to be here.
11    All right.  Ms. Davis, I think that brings us back
12  to you.
13    **MS. DAVIS:**  Yes, Judge.
14    **THE COURT:**  All right.  Are you ready to proceed?
15    **MS. DAVIS:**  We are, Your Honor.
16    **THE COURT:**  Okay.  All right.  Ms. Bales, we've got
17  the defense motion to suppress, and I'll be happy to hear from
18  the government.
19    **MS. BALES:**  Thank you, Your Honor.  Your Honor, the
20  government calls Investigator Russell Vinson to the stand.
21    **THE COURT:**  All right.  If you'd come right here to
22  the clerk's bench and be sworn.
23    **THE CLERK:**  Please state your name for the record.
24    **THE DEFENDANT:**  Russell Vinson.
25    WITNESS - INVESTIGATOR RUSSELL VINSON - DULY SWORN

| | |
|---|---|
| 1 | **THE WITNESS:** I do. |
| 2 | **THE COURT:** Thank you, sir. If you'll come around |
| 3 | here to the witness stand. Mr. Vinson, it's on this side. |
| 4 | And they put two boxes just to confuse you. Once you get |
| 5 | settled in, if you can move that microphone up where you can |
| 6 | speak into it. |
| 7 | All right. Ms. Bales. |
| 8 | **MS. BALES:** Thank you, Your Honor. |
| 9 | **DIRECT EXAMINATION BY THE PLAINTIFF** |
| 10 | BY MS. BALES |
| 11 | **Q** Investigator Vinson, with whom are you employed? |
| 12 | **A** Union County Sheriff's Office. |
| 13 | **Q** And how long have you been employed with them? |
| 14 | **A** Nineteen years. |
| 15 | **Q** And how is it that you became involved in the incident |
| 16 | case? |
| 17 | **A** I'm the investigator over narcotics at Union County |
| 18 | Sheriff's Office. |
| 19 | **Q** All right. And how did this particular incident case |
| 20 | begin? |
| 21 | **A** We did a traffic stop on our CI that same day that she |
| 22 | had an actual bench warrant on her, and when we took her to |
| 23 | our office to do an interview on her, that's how we got this |
| 24 | case started. |
| 25 | **Q** And you mentioned a bench warrant. Was there any other |

1     reason?

2     **A**     Yes.  Her vehicle truck had a busted out window.  The

3     back of her truck the window was busted out in it.

4     **Q**     All right.  What happened when she was stopped on the

5     bench warrant?

6     **A**     Rephrase.  I'm sorry?

7     **Q**     What happened when she was stopped on the bench warrant?

8     **A**     Oh.  When she was stopped on the bench warrant she had in

9     her possession some meth and also some marijuana.

10    **Q**     Okay.  So what happened next?

11    **A**     We left the traffic stop and took her to our office, our

12    task force building, and started conducting an interview with

13    her.

14    **Q**     Okay.  At the time that you located the meth, what did

15    you do?

16    **A**     At the time we located the meth we asked her if she was

17    willing to work with us to help her on her -- the meth that we

18    had found, which we can't promise her that it will help.  We

19    just tell her that it's still left up to the solicitor, but

20    our recommendations will go to the solicitor.

21    **Q**     Okay.  Was anything searched?

22    **A**     Her vehicle.

23    **Q**     Was she searched?

24    **A**     Yes.

25    **Q**     Okay.  What happened next?

1  **A**    Once we got to the task force building she just -- we

2  started asking her -- we kind of do a history, you know, go

3  back and get history and figure out what kind of drugs she has

4  used in the past and that kind of nature.  Then, who are the

5  people that she's ever dealt with.  And probably some of the

6  people that we could actually do some buys from.

7  **Q**    Okay.  Had you had any prior dealings with this CS

8  before?

9  **A**    Yes.

10  **Q**    In what way?

11  **A**    She had been under investigation before on prior drug

12  cases.

13  **Q**    In what sense?

14  **A**    Where she was actually -- we had gotten Crime Stopper

15  tips that she was dealing drugs out of her neighborhood and at

16  different places over town, and then we just started an

17  investigation looking into her.

18  **Q**    Okay.  Now, what happened after or when you were at

19  the -- when you took her back to headquarters?

20  **A**    She brought up the name of Dan Santis that she could buy

21  meth from.  And at that point I was not familiar with

22  Mr. Santis.  So, I reached out to Mr. Charles Nations,

23  investigator narcotics at Laurens County, and then he informed

24  me that he knew Mr. Santis and Mr. Santis had previously been

25  in a narcotics investigation.

**Q**     And in what sense was he involved in narcotics?

**A**     That where he was a drug dealer selling drugs.

**Q**     Okay.  Now -- so, what happened after -- what happened next?

**A**     Then we just started having her reach out to Mr. Santis trying to set up a deal.  Our thing -- what we asked her, it was tax season.  So, we obviously asked her how much she had ever purchased before, and she said that she'd never -- just maybe an ounce or two.  But she said that she could get a pound of meth from him, that she could tell him that she just got her taxes and she needed to make some money.  So it wouldn't be no problem on setting up to get a pound of meth.

**Q**     Okay.  And what happened as to that bench warrant you mentioned?

**A**     Oh.  While we are doing our interview, our kind of historical interview with her, her -- one of her boyfriends, she contacted him on the phone and he in turn went to the magistrate's office and paid off her bench warrant.

**Q**     Okay.  So she provided you this information about Mr. Santis.  What happened next?

**A**     I immediately started calling Laurens County and Newberry County and told them that we were possibly going to set up a deal, and we wasn't sure exactly which county we would have to go to to do this deal.

**Q**     So, how was it that you knew -- how did you know anything

1  about Laurens or Newberry?

2  **A**   Oh.  They had -- our CI, she would never -- we tried to

3  get her to ask him where he was going, where he would actually

4  have to get the meth from.  He never would tell her a specific

5  place.  He just told her that he had a couple of places, one

6  being Newberry and one being Laurens.

7  **Q**   Okay.  So, in taking a step back, she provided

8  information as to Santis, correct?

9  **A**   Yes.

10  **Q**   Did she agree to coordinate a buy?

11  **A**   Yes.

12  **Q**   How did that happen?

13  **A**   Over the phone where we had a task force.  She just made

14  phone calls and asked him, and he told -- in turn told her

15  that, yes, he could set up -- make that arraignment.

16  **Q**   Okay.  So what was the plan?

17  **A**   The plan to start with was for her to go pick him up at a

18  location that he was at.  It was another place that he was at.

19  We was unsure exactly what location that was.  But then when

20  as the deal started and she left her residence when he made a

21  phone call to her or when she made a phone call to him, he was

22  already at her residence.

23  **Q**   Okay.  Now, before -- let me ask this.  Before the buy

24  occurred, what did you do?

25  **A**   Oh.  We -- before we sent her off we give her audio and

1  video equipment, and also give her the government recorded

2  phone.  And then we searched her as well as her vehicle.

3  **Q**  Okay.  Very briefly what -- describe this audio/video

4  equipment that you gave her.

5  **A**  It's called a Casper system, and it's actually a cell

6  phone that is able to record audio and video.

7  **Q**  Okay.  And in this case did you ultimately recover --

8  what did you ultimately recover?

9  **A**  We ultimately recovered the audio.  At that time Casper

10  were doing updates on their system and we had an older phone,

11  and for some reason we were unable to get the video and we

12  only got audio.

13  **Q**  Okay.  How does the Casper work?

14  **A**  The Casper works is that what you do is you put in a ops

15  number, and they'll give you a number, and then you have like

16  a controller which would be me at that time.  I'm the only one

17  that can actually control that.  But -- or whoever, whatever

18  officer, you have one controller.  We actually used SLED's

19  Casper system that day because they have unlimited listening.

20  Our system at the sheriff's office is only three people, three

21  phones can hook up to it.  So SLED has unlimited because we

22  have -- we had Laurens County, SLED, and us involved, so we

23  used their system.

24  **Q**  So, who can hear it?

25  **A**  Anybody that's on the -- that's logged into that Casper

1    number.

2    **Q**    Okay.  After setting up the buy, what happened?

3    **A**    Once we set up the buy she -- after we searched her and

4    searched her vehicle and gave her a recorded phone -- the

5    recording audio, she left out going to meet Santis.  And he

6    was at her house, already at her house.  So she went to her

7    house to meet him.

8    **Q**    How do you know that he was already at the house?

9    **A**    We could hear it through the Casper system on the phone.

10   She -- you could hear it over the phone system saying that he

11   was already at her house.

12   **Q**    Okay.  What happened next?

13   **A**    When she arrived at her house, they went in I think --

14   prior to her getting to his house, she asked him if there was

15   a guy at her house that had been -- had been staying there

16   some.  And he told her, no, that he was not there or his

17   vehicle was not there.  He didn't know if he was there or not.

18   But his vehicle was not outside.

19   **Q**    Okay.  What did law enforcement do?

20   **A**    When we left the task force and she left going to meet

21   Santis, we had us along with SLED surveillance.  We followed

22   her and watched her the whole time.

23   **Q**    Okay.  So where did she go?

24   **A**    She went from our task force to her house.

25   **Q**    All right.  So, what happened next?

**A**     Once they got to her residence, we just set up

surveillance around the house to watch and observe anything

coming and going.  They went in their house, her residence,

and they were there a long time.  I'm not approximately --

probably close to two hours, give or take some time, but...

**Q**     Okay.

**A**     They talked about several different things.  And we're

waiting on a phone call to come in where they would know where

to go to get the meth.

**Q**     And, again, how do you know that?

**A**     She had sent me a text message saying -- several text

messages saying that he's called his plugs or waiting on him

to respond, whichever one responds.  Then that's the one we're

going to go purchase the meth.

**Q**     Okay.  What happened next?

**A**     They were in the residence.  They talked a lot.  At one

point since it had been going on so long, our Casper, it came

over the Casper, the battery was about medium or going to go

low.  So we knew we had to end up going somewhere else.  So I

in turn texted her and asked her to take it and put it, if she

had a charger where she could put it on a charger.  She done

that.  She texted several times saying, I'm sorry it's taking

so long, you know, we're just waiting on this -- for them to

phone call so we can go and...

**Q**     So what happened?

1  **A**     Eventually he got the phone call and they left.  And she

2  texted me and said that they were going to Laurens.

3  **Q**     Okay.  What did law enforcement do?

4  **A**     At that time we called Laurens County and notified them

5  that we were coming to Laurens County, that this deal was

6  supposed to take place in Laurens.  And then we surveilled --

7  we followed them and set up surveillance and followed them to

8  Laurens.

9  **Q**     Okay.  So, when they -- after they left the house, what

10  happened?

11  **A**     They left her house, and then they stopped in the

12  Cross Keys area which is actually in Spartanburg County.  You

13  have to go -- from Union you have to go into a small portion

14  of Spartanburg County to come back into -- before you get to

15  Laurens County.  And there's a little convenience store there

16  and a Dollar General, and they stopped at that convenience

17  store and got some gas.

18  **Q**     Okay.  What happened next?

19  **A**     While they were getting gas, I was not in observance of

20  the vehicle.  A SLED officer, one of my other investigators,

21  was across the street at the Dollar General and observed

22  those -- observed them getting gas.  And then when they left

23  from getting gas they went to Laurens, and then they pulled up

24  at a convenience -- what they call a Curb Market in Laurens.

25  **Q**     All right.  Now, who all was involved?  How many agencies

1  were involved?

2  **A**    We had three agencies.  Were SLED, Union County and

3  Laurens County.

4  **Q**    All right.  And what was the extent of their involvement

5  in general?

6  **A**    SLED already had an agent that was with us that day and

7  working with us the whole time.  We had -- he regularly works

8  out of our office.  I'm not going to say assigned, but he's

9  there a good bit.  He was actually with us.  We had two

10  vehicles.  We had my vehicle and then we had the SLED vehicle.

11  And then in Laurens County I think their task force had like,

12  I'm going to say, three vehicles that they actually had that

13  could surveil on and watch.

14  **Q**    What happened when you arrived at the Curb Market?

15  **A**    Actually, when they arrived at the Curb Market we pulled

16  into a -- my vehicle pulled into a CVS parking lot, and we had

17  been told by Charles Nations with Laurens County, that be on

18  the lookout, that they always in that area, that group did a

19  countersurveillance.  That they would watch people to make

20  sure nobody was, you know, setting them up, or law enforcement

21  wasn't watching them.  We had a -- on my vehicle we had a car,

22  vehicle that come in and kind of was acting suspicious and

23  watched us.  So I pulled off and left and started going, just

24  riding through a couple of neighborhoods and started back

25  towards Union.  And that vehicle followed me.  So at that time

1    I notified them and told them, hey, I think I've been made.

2    I'm just going to start heading back out of town so they won't

3    know.

4    **Q**    You mentioned a group.  What group are you talking about?

5    **A**    I'm not exactly sure what they call them, but Nations

6    from Laurens County can explain.  He told us that that group

7    in that area of town that actually set up a -- that was their

8    territory to sell drugs in.

9    **Q**    Okay.  So, what -- who was driving at this time?  Who was

10    driving the vehicle?

11    **A**    Santis.

12    **Q**    Okay.  And who else was in the vehicle?

13    **A**    The CI.

14    **Q**    All right.  So what happened after you drove off?

15    **A**    After I drove off, the other officers kept surveillance

16    on the vehicle.  And then they did a - I finally got a phone

17    call coming and telling them where to meet and then --

18    **Q**    And "they" being who?

19    **A**    Santis and the CI.

20    **Q**    Okay.

21    **A**    Received a phone call -- he received a phone call saying,

22    telling him where he needed to come.  And he said he could be

23    there in around three minutes.

24    **Q**    All right.  What happened next?

25    **A**    They left.  Then went to that location and met with the

1   other supplier.

2   **Q**   And how was it that you know this?

3   **A**   The other -- our other agents, our SLED agent and Laurens

4   County observed them going into this like little neighborhood,

5   it's a cul-de-sac turnaround, dead end, only one way in and

6   one way out.

7   **Q**   Okay.

8   **A**   And then we could also hear it on Casper that they had

9   arrived at that location.

10   **Q**   All right.  After they left to go to this other location,

11   what happened?

12   **A**   When they pulled up to this location you could hear a

13   male subject talking to them over the Casper system.  A lot of

14   it you can't hear.  Some of it is going in and out.  That's

15   kind of -- the Casper system works off of cell phone base.  So

16   sometimes if you don't have a good signal, it kind of goes in

17   and out, or it just depends on how the noise is, how much

18   noise level.  You can hear some of it saying, they talked

19   about some cash out money that Santis had already owed the

20   drug dealer prior.

21   **Q**   Okay.  And again, "they," who are you referring to as

22   they?

23   **A**   The CI and Santis.

24   **Q**   Okay.

25   **A**   In talking to the guy that they were purchasing the meth

1  from.

2  **Q**   All right.  So who was talking to this unknown third

3  person?

4  **A**   Santis.

5  **Q**   Okay.  All right.  What happened next?

6  **A**   They made the deal.  My CI sent me a text saying that

7  they had the -- had the dope and then they left.

8  **Q**   All right.  At that time did you receive any other text

9  messages?

10  **A**   Yes.  We were actually in a group text with us, and

11  Laurens County and SLED with each other, and one of our

12  investigators that was in the vehicle with the SLED agent

13  texted over the group and said the deal is done.

14  **Q**   All right.  At that time what did you believe?

15  **A**   At that time I believed that they had purchased the pound

16  of marijuana.  That the deal was --

17  **Q**   I'm sorry, what --

18  **A**   I mean, I'm sorry.  They had purchased the pound of meth.

19  They had purchased the pound of meth that the deal was set up

20  for and then they left going back to Union.

21  **Q**   And where did you believe that meth was located?

22  **A**   In the truck.

23  **Q**   Okay.  So, what happened next?

24  **A**   Then we followed them all the way back into Union where

25  we took the traffic stop.  Actually happened right at the CI's

1  house.  They were going back to the CI's house, and right

2  before they pulled in, Santis had noticed that law enforcement

3  was behind them.  And then he just kind of kept going right

4  around the block, and that's when the traffic stop was made.

5  **Q**   Okay.  Why did you decide to conduct the traffic -- or

6  that stop?

7  **A**   We decided to since it was a large quantity of meth for

8  the money, and with Santis actually driving, we didn't want to

9  get into a car chase, him toss the dope and put other lives in

10  danger.  So we knew they were going back to the CI's house.

11  So that's why we just went ahead and done it at her residence.

12  **Q**   All right.  So, when they returned to the CI's

13  neighborhood, what happened?

14  **A**   Right before they pulled into her driveway, Santis sees

15  there was probably at that time six -- five to six law

16  enforcement vehicles behind him.  All of them was unmarked

17  except for one.  We had one marked vehicle that had waited

18  till we came back into Union and then kind of got in with us.

19  When he seen that, he went right past the residence on around

20  into a curve, and he was trying -- you could hear over the

21  Casper system hearing him tell her that she needed to throw

22  out the meth and get rid of it.  And then she, in turn, told

23  him that she couldn't, that we were right behind her and we

24  would see it, that she couldn't get rid of it.  She didn't

25  have anywhere to hide it.

1   **Q**    Okay.  And how were you involved with this traffic stop?

2   **A**    At that point the street that she actually lives on

3   runs -- there's a railroad track that splits it and the main

4   highway when you turn off onto her street.  So her street is

5   about halfway down that block.  And there's another road that

6   kind of -- or that road, the whole road really kind of circles

7   and comes back out into the main highway.  So, when they

8   turned going toward her house, I went around the back side to

9   intercept them just so that way there couldn't be a car chase,

10  that we could block them off before they got out of the

11  neighborhood.

12  **Q**    And what happened?

13  **A**    Once the stop was made, the stop, I think the initial

14  stop was made by the SLED agent and our investigator.  They

15  actually made the traffic stop and took Mr. Santis and the CI

16  out of the vehicle and then I, in turn, when I come up they

17  already had Santis out and had him handcuffed, and he was on

18  the ground when I got there.

19  **Q**    Okay.  And when you arrived, what did you do?

20  **A**    When I arrived I immediately went to Santis and advised

21  him of his rights and asked him what had took place.

22  **Q**    Okay.  Were there any questions posed to the CS?

23  **A**    Yes.  At one point I asked her where the dope was in the

24  vehicle.

25  **Q**    And what was the response?

1  **A**   It's in the truck.  In the seat.

2  **Q**   Okay.  So what did you do when you approached Santis?

3  **A**   I advised him of his rights, Miranda rights.

4  **Q**   And what happened next?

5  **A**   I asked him what, you know, where they'd been or what,

6  you know, what they were doing.  And he advised me that the CI

7  had asked him to go to Laurens County and then purchase some

8  methamphetamine, that he had set up the deal and he had drove

9  her over to do that.

10          **MS. BALES:**  Beg the Court's indulgence.

11          (Pause.)

12          **MS. BALES:**  Thank you.  Please answer any questions

13  defense counsel has for you.

14          **THE COURT:**  Cross examine.

15            **CROSS EXAMINATION BY THE PLAINTIFF**

16  **BY MS. DAVIS**

17  **Q**   Good morning, Investigator Vinson.

18  **A**   Good morning.

19  **Q**   So, I want to start off with your engagement with the CI.

20  What day was it that you actually tried to execute the bench

21  warrant?

22  **A**   It was on the same day that we did this traffic stop.

23  **Q**   So was this in the morning?

24  **A**   I'm not sure of the exact time, but it was sometime

25  around lunchtime or maybe a little -- sometime in between the

1  morning and lunchtime.

2  **Q**   Okay.  So was there ever a break between when you got the

3  CI on the bench warrant and when she went to do the controlled

4  buy?

5  **A**   Yes.

6  **Q**   Okay.  What happened during that break?  Did she leave

7  you guys or was she with you the entire time?

8  **A**   No.  She was with us the whole time.

9  **Q**   Okay.  So from lunchtime until she left around, I guess,

10  around five-ish --

11  **A**   Yes.

12  **Q**   -- she was with you for that entire five hours?

13  **A**   Not actually with us.  She was at our task force while we

14  set up this deal, and then once the deal was set up and we did

15  all our searching and that, then she left and went to her

16  residence.

17  **Q**   Okay.  I see.

18  **A**   She was not out from under our surveillance the whole

19  time.

20  **Q**   So what was the charge for the bench warrant?

21  **A**   I'm not really sure.  It was a misdemeanor bench warrant

22  and they -- she called -- like I say, she called one of her

23  boyfriends, and he called -- he went up to the magistrate's

24  office and paid it off.  The actual reason for doing that was

25  SLED's policy.  The SLED agent there says that they would not

1  actually work a CI on an active -- if they had an active

2  warrant.  So then she, in turn, called her boyfriend and he

3  went and paid it off.

4  **Q**    Okay.  So when you -- you guys pull her over just like a

5  regular traffic stop?

6  **A**    After -- you talking about when she got -- oh, that day,

7  yes.

8  **Q**    Yes.

9  **A**    Because we knew that she had a bench warrant, and we also

10  knew that her window on her back of her truck was busted out.

11  **Q**    Okay.  So who was it -- who was with you when you pulled

12  her over?

13  **A**    Myself, Investigator Dylan Beheler, which was on our task

14  force with the City of Union, and Reggie Ellison who is also

15  an investigator with Union County Sheriff's Office.

16  **Q**    So when you pulled her over did you guys take her out of

17  the car or did she stay in the car the whole time?

18  **A**    No.  She had got out of the car.

19  **Q**    Okay.  And so once she's out of the car, is that when you

20  discussed -- you guys searched the car, correct?

21  **A**    Yes.  The actual stop, first when she got out of the car,

22  she had the meth in her hand or in her pocket.  She tried to

23  toss it on the ground.  And I seen her when she tossed it on

24  the ground.  And then that time is when I asked her about the

25  meth.  And then that's when we searched the vehicle and found

1   the marijuana in her pocket in the vehicle.

2   **Q**   Okay.  So when did you guys have the conversation with

3   her about acting as a CI, was it during the traffic stop back

4   at your --

5   **A**   Back at the task force.

6   **Q**   Okay.  Did you guys arrest her at that point on the bench

7   warrant or for the drugs?

8   **A**   No.  We just told her she was detained and took her back

9   to the task force to do the interview.

10   **Q**   Okay.  So when you interviewed her, did you guys ask her

11   if she had been actually using before you talked with her?

12   **A**   Yes.  When we done our historical interview with her,

13   when we actually first bring somebody in, we kind of ask them

14   the history, you know, what kind of drugs they've used in the

15   past, and if they have used before.  And she said, yes, she

16   had used.

17   **Q**   Did she indicate whether she had used that day?

18   **A**   No.  She did not.

19   **Q**   And did you-all ask her if she had used that day?

20   **A**   Yes.

21   **Q**   And what was her response?

22   **A**   That she hadn't.

23   **Q**   That she had not used.  So did she tell you guys what she

24   was doing with the meth in her hand?

25   **A**   She never really actually stated.  She just said she had

1   it.

2   **Q**   So, while you guys take her to -- when you take her to

3   the task force building or your headquarters, is that when she

4   called to get the bench warrant recalled?

5   **A**   Yes.

6   **Q**   Okay.  And did you guys listen to that call?

7   **A**   Yes.  She had it on speakerphone.  Any time that someone

8   is there like that we make them put it on speakerphone so that

9   we can hear.

10   **Q**   And that person was not Mr. Santis that she talked with?

11   **A**   I'm sorry?

12   **Q**   The person she talked with about paying to recall the

13   bench warrant, that wasn't Mr. Santis?

14   **A**   No.

15   **Q**   Okay.  So, once you -- did you-all discuss with her being

16   a CI before the bench warrant was recalled or after she paid

17   off the bench warrant?

18   **A**   I'm not really sure.  I mean, we were all right there

19   together.  So I'm not sure if he got it paid off.  I know we

20   explained to her that SLED could not work her as a CI.  So I'm

21   going to say we talked to her before because we knew that we

22   couldn't hire her as a CI if she had a bench warrant.

23   **Q**   Okay.  So she -- so you-all talked with her about being a

24   CI based on the drugs that you found in the car, nothing to do

25   with the bench warrant?

1  **A**    Yes.

2  **Q**    Okay.  So, while you're talking with the CI, was there

3  anything to memorialize this conversation?

4  **A**    Was there anything to what?

5  **Q**    Did you make a report on this conversation with the CI?

6  **A**    We just do our -- it's like a CI packet that we make.

7  And then we just do like a little historical on it, the notes

8  and that.  I mean, that goes in their CI file.

9  **Q**    So what all do you put in this CI packet?

10  **A**    It's her information like name, date of birth, where she

11  lives, tattoos, just general information.  And then we do a CI

12  agreement, and then we do a criminal history.  And then we do

13  a photograph.

14  **Q**    So did you run her criminal history before you asked her

15  to be a CI or after?

16  **A**    It was after.  I don't have access myself to run it.  It

17  has to be done by our ladies in the office, and usually that

18  takes a little while before we can get that done.

19  **Q**    Okay.  So you testified that you -- when you arrested

20  her, at some point you called other investigators that were

21  familiar with her; is that correct?

22  **A**    Yes.  Well, I mean, there was -- what I actually did is

23  not when we arrested or when we took her to do an interview.

24  I didn't, in turn, because at this point we had my three

25  officers that work out of my task force.  And then I called

1  the SLED agent which works out of our -- Justin Meeks that

2  works out of our office, and called him and he was on his way

3  to Union anyway.  So then he came onto the task force.

4  **Q**     So who was it that had previous dealings with her?

5  **A**     Everybody from Union County and City of Union is on our

6  task force.

7  **Q**     So had you personally arrested her?

8  **A**     No.

9  **Q**     And had anyone that was involved in the buy arrested her?

10  **A**     Not to my knowledge.  I can't testify to the others, but

11  I don't think so.  Not on drug-related charges.

12  **Q**     Okay.  So when you say that people were familiar with

13  her, what exactly does that mean?

14  **A**     We've got several Crime Stopper tips that come in that

15  she was dealing drugs, and then from other CIs that we had

16  talked to before saying that they could purchase meth from our

17  CI.

18  **Q**     Okay.  So was she under investigation at that time at

19  all?

20  **A**     Yes.  I mean, we had started setting up trying to

21  actually do some buys from her.

22  **Q**     So you testified that she had never served as a CI

23  before?

24  **A**     No.  Not to my knowledge.

25  **Q**     Okay.  So if she had served as a CI before, would that

28

1    have been -- would there have been a record of that somewhere?

2    **A**    Yes.

3    **Q**    And did you-all do a search of those records to see if

4    she had been a CI before?

5    **A**    I did not.  When our new administration came in, our new

6    Sheriff three years ago, two-and-a-half years ago, he

7    didn't -- that's when I actually moved into narcotics was six

8    months after he had been in office.  And he wanted to revamp

9    the whole narcotics division.  So what we did is when we went

10   in, we started and made all new CIs.  We started over with all

11   the CI files and we started basically from scratch and went

12   from one on.  But I never did look back in the previous CI

13   files to see if she was a CI.  To my knowledge she never was.

14   **Q**    And did you guys ask her if she had served as a CI

15   before?

16   **A**    I can't recall if we did or not.

17   **Q**    So while you were talking with her, how did you guys get

18   to asking her about giving you information about other drug

19   activity?  And I guess what I mean by that, was it a general

20   question or was it specifically about drug activity?

21   **A**    Generally ask -- the question was, we asked her who she

22   was getting her meth from and who she could buy from.

23   **Q**    So do you guys ask her specifically about meth?

24   **A**    Yes.

25   **Q**    Is there a reason you guys asked her about meth

1  specifically?

2  **A**    That's just -- when we asked her -- when we do a

3  historical to start with, we ask them what their drug of

4  choice is and the drugs that they're using.  That was what she

5  said that she used.

6  **Q**    So once you asked her about where she could get meth,

7  from who all did she list as being able to get meth from?

8  **A**    She listed several of them.  She told us several

9  subjects.  But then she told us Santis was one.  She actually

10  told us Santis had -- she had got from Santis before and that

11  he was kind of homeless or in between places to actually live,

12  and that he wanted to come stay with her and that they could,

13  you know, start purchasing meth together.

14  **Q**    So, is that why you-all chose to do a controlled buy with

15  Santis instead of any of the other people she mentioned?

16  **A**    We chose to make the controlled buy from him because she

17  could get the biggest quantity of meth from him than from any

18  other that she dealt with with just small amounts.

19  **Q**    So who offered the information about the quantity?  Did

20  you-all ask her about getting a specific quantity?

21  **A**    She did.  When we do, when we talk to a CI, we ask them

22  how much they normally purchase, because most times we don't

23  want to send them if they can't purchase an ounce.  We don't

24  want to send them in and ask for a kilo.  So we ask them how

25  much they usually purchase, and she told us it is usually

1  around an ounce but that she knew she could get a pound

2  because they had talked about it before.  And so that's when

3  we said, well, let's try and let's say, you know, you just got

4  your tax money.  Let's say you got $1,500 to go purchase, you

5  know, a pound of meth.

6  **Q**   So when she said they had talked about having -- about

7  Mr. Santis having more meth or having about a pound of meth,

8  what is -- can you give us a little bit more information about

9  those discussions she just said --

10  **A**   The conversation was that if he was going to purchase

11  that much meth that he would have to go to either Laurens or

12  Newberry County to purchase it.

13  **Q**   So she had never bought that much meth from Mr. Santis?

14  **A**   Not to my knowledge.  She told us she hadn't.

15  **Q**   Had she ever seen Mr. Santis with that amount of meth?

16  **A**   I think she said she had.  I can't recall whether I'm a

17  hundred percent, but I believe she had made that reference

18  when she told us that she thinks she could get a pound because

19  he was known to carry a lot of weight.  That was just her

20  words.

21  **Q**   So when you-all were talking with her about Santis and

22  she told you he was homeless, was it you-all's idea for her to

23  tell him that if he got her the meth he could stay with her?

24  **A**   She never -- no.  Not to my knowledge.  Because she told

25  us that she never did tell him he could actually stay.  So I'm

1  not -- prior to that I'm not sure what kind of agreement they

2  had made.

3  **Q**    So then what was -- when she was telling you that he was

4  homeless, what was the relevance of that discussion?  Why did

5  she tell you he was homeless?

6  **A**    Well, she just said it -- I mean, she kind of said that

7  he just really didn't have a -- I think she did say homeless.

8  But she said he don't really have a place to stay in Union.

9  That he had been staying with several different people in

10  Union, just different places.  And that he was just looking

11  for somewhere to stay.

12  **Q**    And so did she say that he wanted to stay with her

13  specifically?

14  **A**    Yes.  At her residence.

15  **Q**    Did she talk at all about their prior relationship?

16  **A**    No.

17  **Q**    Did she talk at all about how she knew Mr. Santis?

18  **A**    Just through -- just purchasing some meth before.  That's

19  all that she told us that's how she knew him, just by dealing

20  with him before.

21  **Q**    Did you guys ask how long she had known Mr. Santis?

22  **A**    I don't recall.

23  **Q**    And did you guys ask if their relationship was limited to

24  the using drugs together?

25  **A**    No.

1  **Q**    So, she's on the call.  So once you guys -- excuse me.
2  When did you-all actually officially decide that Santis would
3  be the target?

4  **A**    After we talked to her about who, you know, who she could
5  purchase meth from and how much, and that's when she said that
6  she thinks she could get a pound.  That's when we decided that
7  Santis was going to be the person we went after.

8  **Q**    So then did you direct her to call Santis and ask for a
9  pound?

10  **A**    Yes.

11  **Q**    So, your report says -- and actually, well, let me pull
12  it up.  This is Exhibit 2.  And actually there's a book right
13  next to you, Investigator Vinson.  If you will flip, the first
14  one is Exhibit 2.  It's going to be your report, and I put it
15  up here.  Thank you, Laura.

16          **THE COURT:**  All right.  Let me ask the prosecution,
17  Ms. Bales, with respect to these exhibits, the Court has been
18  provided a binder with copies.  Are there any objections to
19  this or any of these exhibits, or are you-all in agreement as
20  to their admissibility?

21          **MS. BALES:**  As to the --

22          **THE COURT:**  I think we're dealing with Exhibit 2
23  now.  But I assume we're going to be getting to these others?

24          **MS. BALES:**  Certainly.  We have no objections to any
25  of these exhibits except what they believe to be the official

1  transcript.  It's the government's position that the

2  transcripts are not reflective of what it is that we

3  understand is being said.

4          **THE COURT:**  Okay.  So is that the Exhibit Number 8?

5          **MS. BALES:**  That is correct, Your Honor.

6          **THE COURT:**  All right.

7          **MS. BALES:**  And then as far as the remaining, Your

8  Honor.

9          **THE COURT:**  And 15 and 16 look like placeholders.

10         **MS. BALES:**  Correct.  As far as the others, Your

11 Honor, no.

12         **THE COURT:**  All right.  So just to keep this moving

13 along then --

14         **MS. BALES:**  Of course.

15         **THE COURT:**  -- I will go ahead and admit Exhibits 1

16 through 7 and 9 through 14.

17         (Whereupon, Defense Exhs. 1 - 7 and 9 - 14 are

18 admitted.)

19         **THE COURT:**  And Ms. Davis, you and Ms. Bales can

20 just use those as you wish.  They are in evidence.  As to

21 Exhibit 8, the Court notes the government's objection.

22         **MS. DAVIS:**  Thank you, Judge.

23 **BY MS. DAVIS**

24 **Q**   So I just pulled up your -- we have your report,

25 Investigator Vinson, and we'll just use it as we go through

1  these next bit of questions.

2      So I just asked about the calls that you guys asked the

3  CI to Santis.  Do you remember how many times she called

4  Mr. Santis?

5  **A**    I'm not familiar how many.  I know I think it was several

6  times.  I'm not sure of the exact number.

7  **Q**    Okay.  And why did she call him so many times -- well,

8  actually let me rephrase that.  Did she talk to him every time

9  she called him?

10 **A**    I can't recall on that either.

11 **Q**    Okay.  So, in your report it says that one of the calls

12 was recorded.  So did you guys record any of the calls that

13 she made to Santis?

14 **A**    No.  I didn't preserve any of the phone calls.

15 **Q**    Okay.  So when she did finally get in touch with him,

16 what was their discussion?  He was on speaker first?  My

17 apologies.  Was he on speaker?

18 **A**    Yes.

19 **Q**    Okay.  So when she called him, what was the content of

20 their conversation?

21 **A**    One of the first conversations, that he was at another

22 residence somewhere in Union County, and that it was our

23 understanding that she was going to go pick him up from that

24 residence.  And that's where they were going to leave from

25 there and go make the buy.

1   **Q**   Did they ever discuss his living situation in these phone

2   calls?

3   **A**   Not that I recall.

4   **Q**   So, did on the first call where she talked about her

5   going to pick him up, did she mention getting a pound of meth

6   from him on that call?

7   **A**   Yes.  I think so.

8   **Q**   And what was Mr. Santis' response?

9   **A**   He said, yes, that he could make the deal.  All she had

10  to do was come pick him up and he would -- I think he

11  needed -- he said he needed to get away from where he was at,

12  wherever he was at.

13  **Q**   So when he said he needed to get away from where he was,

14  in that conversation did they talk at all about the living

15  situation?

16  **A**   Not that I recall.

17  **Q**   Okay.  So, once you in your report and your testimony

18  said that Santis wouldn't give her the location of the buy,

19  what would he say when he wouldn't give the location?

20  **A**   He said -- he just kept telling her he didn't -- he

21  didn't know where he was going to go.  They didn't know where

22  they were going yet.

23  **Q**   So he just said he didn't know where he was going?

24  **A**   Yeah.

25  **Q**   Did he identify who he was going to get the drugs from?

1   **A**     No.

2   **Q**     And did the CI ask him who he was getting them from?

3   **A**     I think she never asked who the individual was.  She kept

4   asking where they were going to go.

5   **Q**     So, once they got off the call did you-all have any other

6   conversations with the CI?

7   **A**     Once we got off the phone call we just -- other than

8   sitting, telling her, you know, equipping her with the audio

9   and the recording and the money, that's the only other thing

10  that we talked about.

11  **Q**     So at that point did you have any concerns about the CI's

12  reliability?

13  **A**     No.

14  **Q**     And why not?

15  **A**     We had searched her.  We had looked over, you know,

16  her -- on her interview and she had told us some of her

17  history, and we seen no concerns under her history that would

18  leave us to believe that she was unreliable.

19  **Q**     Did you question her at all about her past drug dealing?

20  **A**     Not about her past drug dealings, no.  We just basically

21  discussed, you know, hey, what have you been to jail for; what

22  have you been charged; what have you been convicted of.

23  **Q**     And did you ask her at all about the tips that came in

24  about her?

25  **A**     No.  We didn't discuss those.

1  **Q**    Okay.  So, once the call is made to Mr. Santis and you

2  all get ready to leave, when did you find out that she's not

3  going to pick him up from this unknown location?

4  **A**    As soon as she leaves I think -- I'm not a hundred

5  percent sure if he called her or she called him, but it was on

6  Casper that they were talking, and then that he actually said

7  he was at her residence.

8  **Q**    Okay.  So she had already left the task force by then?

9  **A**    Yes.

10  **Q**    Okay.  So when you found out they were going to her home,

11  did you have any concerns about them going to that location?

12  **A**    No.

13  **Q**    And did you have any concerns since you hadn't been able

14  to search her home?

15  **A**    No.

16  **Q**    So normally when you-all do this type of buy, do you guys

17  try to search every location you know they're going to be in?

18  **A**    Normally the ideal situation, if we knew that she was

19  going to go back to her house, yeah, we would have tried to go

20  to her house and do the search before the deal ever went down.

21  **Q**    Right.

22  **A**    But we didn't even know that that's -- our thoughts were

23  she was going to pick him up at another location and they were

24  going to that location and go make the deal.

25  **Q**    So once you find out she's going to her house, why didn't

1   you call off the operation?

2   **A**    I had no reason to actually call it off.

3   **Q**    So once they got to the house, you said that you-all set

4   up in areas where you could surveil the house.  Were you guys

5   able to see the front door?

6   **A**    Yes.

7   **Q**    Were you guys -- I don't know, does the house have a back

8   door?

9   **A**    Yes.

10  **Q**    Were you guys able to see the back door?

11  **A**    Yes.

12  **Q**    And so I know you testified about this before, but I just

13  want to walk through it again.  So how many officers were

14  involved?

15  **A**    While we were in Union County there was four.  Four

16  officers involved.  One SLED agent and three from the Union

17  County Task Force.

18  **Q**    And how many vehicles were you-all split into?

19  **A**    Two.

20  **Q**    And so was one vehicle positioned in the front of the

21  house?

22  **A**    Yes.

23  **Q**    And the second vehicle was in the back of the house?

24  **A**    Yes.

25  **Q**    So, you said that they had stayed at the house for about

1  two hours, correct?

2  **A**    Yeah.  Around that time period.  I don't know the exact

3  time, but it was a long time.

4  **Q**    Okay.  So you also testified that while they were at the

5  house, at some point her Casper phone started to die?

6  **A**    Yes.  I think it was actually SLED's system.  And it

7  would show up -- Justin Meeks was actually the operator since

8  it was their system.  And then he in turn either -- not sure

9  if it was over radio traffic or we used SLED's Piedmont

10  channel because we were different agencies involved.  I'm not

11  sure it was over radio or through our group text.  But he

12  advised that, hey, Casper just showed up medium battery

13  charge.  And that's when I, in turn, texted her and she could

14  put -- if she had a charger that she could put it on charge,

15  and she said, yes.

16  **Q**    Okay.  So the Casper phone was different from the phone

17  she was texting you on?

18  **A**    Yes.

19  **Q**    Okay.  So she would have had two cells phones with her?

20  **A**    Yes.

21  **Q**    Okay.  So, and I just want to pause and break to talk a

22  little bit about this technology.  So the Casper is only

23  transmitting what you hear from her?

24  **A**    You can -- the Casper system does audio and video.  Both.

25  And it's just like -- even when the system is -- or when it's

1    recording or doing, you can still make phone calls on it.

2    It's like a regular cell phone.  You can look on the internet,

3    you can make phone calls, you can do text, you can do anything

4    a cell phone can do --

5    **Q**    Got you.

6    **A**    -- still.  And it's recording video and audio.

7    **Q**    So but she wasn't texting you from that phone?

8    **A**    No.

9    **Q**    So, were you able to see the video even though the file

10   got corrupted?

11   **A**    Some, yes.  Because at that time it was actually still

12   going on.  And like I said, it just depends on what area you

13   were in with the cell phone service.  Sometimes it will be

14   fuzzy.  Sometimes it will go in and out just like that.  And

15   the audio as well will do the same thing, just kind of went

16   out of cell service.

17   **Q**    Okay.  Got you.  So she didn't have like a wire on her?

18   **A**    No.

19   **Q**    It was just this phone?

20   **A**    Just a cell phone.

21   **Q**    So if she would leave the phone -- she could leave the

22   phone and walk away from it?

23   **A**    If you let -- yeah.  You can lay it down and walk away

24   from it.

25   **Q**    Got you.  So, and then once -- what you-all can hear in

1 these two cars, both sets of cars can hear everything that's
2 going on from the phone?

3 **A** Yes.

4 **Q** Okay. So, back to when you-all got to her house. So
5 there was a discussion about whether anyone was there. When
6 you guys got there, did you guys see any other cars?

7 **A** No.

8 **Q** And did she alert you to anyone else being in the house?

9 **A** She had told us before of a car that somebody -- that
10 possibly might be at their house that would a lot of times
11 stay out back and didn't live there. But he was out back and
12 messed around in her shop. They had a bunch of stuff stored.
13 She let people -- or her dad let people store stuff in the
14 shop back there.

15 **Q** I got you. Do you recall anyone coming to the house
16 while they were there?

17 **A** Yes.

18 **Q** So did anyone see that person come into the house?

19 **A** Yes. I think -- I was in the back. So, I mean, I never
20 actually seen him where he went in. I do recall on the Casper
21 hearing him knocking at the door, and they went to the door
22 and let him in.

23 **Q** Okay. Did you-all at any point identify who that person
24 was?

25 **A** All I know is it was I think a Justin is what you could

1    hear on the Casper.  That's the guy the -- Justin was the name

2    that we got before.  I didn't know who that was.

3    **Q**    And did you have any concerns for this unidentified

4    person coming into the home during this buy?

5    **A**    No.

6    **Q**    It's not included in your report that this third person

7    came to the home.  Is there a reason why not?

8    **A**    I just didn't list it.

9    **Q**    Do you know how long he stayed at the home?

10   **A**    I'm not really sure.  The conversation wasn't on the

11   Casper that you could hear him.  It wasn't that long.

12   **Q**    Do you remember him leaving at all?

13   **A**    I'm not sure if he left or actually went to the back or

14   went into the shop.  I'm not really sure when he left.

15   **Q**    Okay.  So there's about, on the audio, about 40 minutes

16   where it's quiet.  Do you recall that?

17   **A**    That's going to probably be the time that I asked her to

18   put it on charge.

19   **Q**    Okay.  That's exactly what I was going to ask.  Did she

20   text you at all during that time?

21   **A**    Just the texts only that I received were, you know, I'm

22   sorry it's taking so long.  We're trying to get in a hurry

23   but, you know, we just waiting on that phone call.  I mean,

24   she says there's nothing I can do till we get that call.

25   **Q**    And do you have any idea what was happening during those

1   40 minutes?

2   **A**    No.

3   **Q**    Do you recall Mr. Santis and the CI discussing doing meth

4   while they were in the home?

5   **A**    No.

6   **Q**    Do you recall them discussing her having meth in the

7   house?

8   **A**    No.

9   **Q**    Okay.  So, let's talk about when they get ready to leave

10  the house.  Did they have any discussion about who was going

11  to drive?

12  **A**    I think at one point during the Casper she actually says

13  I can drive there and you can drive back, or you can drive

14  there and I can drive back.  But then he actually drove over

15  there and back.

16  **Q**    So did -- when they left the house originally, was she

17  driving or was he driving?

18  **A**    He was driving.

19  **Q**    He was driving.  Okay.  So I'm actually going to go back

20  to the question about the audio and the drugs.  Judge, this

21  is -- we don't agree about the transcript, but I would still

22  like to play the audio out loud for Investigator Vinson to

23  hear.

24          **THE COURT:**  Okay.  Is this the audio from Exhibit

25  11?

44

1          **MS. DAVIS:**  Yes, Judge.

2          **THE COURT:**  Okay.  All right.

3          **MS. DAVIS:**  You can start it at time stamp -- let's

4    start at time stamp 55.

5          (Whereupon, the audio is being played.)

6    **BY MS. DAVIS**

7    **Q**    Investigator Vinson, as you know the audio is -- the

8    quality is not great.  We're going to do our best.  We'll just

9    try and see if we can hear it, but if not we'll just talk

10   about it and see if you remember it.

11         (Whereupon, the audio is being played.)

12   **BY MS. DAVIS**

13   **Q**    We'll actually dispense with the audio.  I'll just ask,

14   do you recall them discussing doing a shot?

15   **A**    I remember hearing that on the Casper but, I mean, don't

16   know -- like I say, it's going in and out a lot.  You can't

17   actually understand part of it.

18   **Q**    Right.  If you had heard them talking about doing a shot,

19   what do you think that would have referred to?

20   **A**    Maybe a drink.

21   **Q**    And given their history with drug use, could it have

22   referred to them using meth?

23   **A**    No.  Because she -- one of the times when we asked her in

24   an interview, you know, how she uses and she says that she

25   snorted, she never said that she actually injected any kind of

45

1   drugs.

2   **Q**   Do you recall Mr. Santis asking her about getting a rig?

3   **A**   I don't recall that at all.

4   **Q**   And can you tell us just in your experience with

5   narcotics, what a rig would mean?

6   **A**   A rig would mean if you're going to inject whatever

7   you -- drug of choice, you're using with a syringe.  That's to

8   me what a rig would be.

9   **Q**   Okay.  Thank you.  So, going back to when they are about

10  to leave the house, there are text messages between you and

11  the officers in the group about them leaving the house.  And

12  Investigator Vinson, if you'll turn to the back I have those

13  text messages for you.  They're the second to last exhibit.

14          **THE COURT:**  Is this Exhibit Number 12?

15          **MS. DAVIS:**  Yes, Judge.  Exhibit 12.

16          **THE WITNESS:**  I truly ain't found them in the book.

17  **BY MS. DAVIS**

18  **Q**   Please take your time.

19  **A**   I can see them on the screen though.

20  **Q**   Oh, yes.  It's on your screen too.  I'm with you,

21  Investigator Vinson.  I'm working this too.  So it's on your

22  screen.

23  **A**   I see it right here.  Okay.

24  **Q**   So, at 5:52 there's a text that says:  Hi, guys.  We're

25  completely operational now and up and going.

1     Do you remember who sent that text?

2  **A**   That's going to be from SLED, Agent Meeks.

3  **Q**   And so he was in the separate car from you?

4  **A**   Yes.  From me he was, yes.

5  **Q**   I got you.  So, when he sent that text was that based on

6  you-all seeing the truck leave her residence?

7  **A**   I think so.  I would say so, yes.

8  **Q**   Did she also text you -- did the CI also text you at that

9  time that they were leaving?

10  **A**   No.

11  **Q**   Okay.  So they leave the home and it's your testimony

12  that Mr. Santis was driving at that time?

13  **A**   Yes.

14  **Q**   And did you guys or did you actually observe him in the

15  driver's seat?

16  **A**   Yes.

17  **Q**   Okay.  So they leave.  How far do they drive before they

18  stop?

19  **A**   Approximately -- it's not to exact miles, probably

20  15 miles.

21  **Q**   Okay.  And then how long were they stopped?

22  **A**   Just a few minutes.  Long enough to get gas.

23  **Q**   Okay.  So they just stopped to get gas, they get back in.

24  Was there anything of note that you could hear on the Casper

25  at this point?

1    **A**     No.

2    **Q**     So, regarding the audio, you said it was going in and

3    out, correct?  So were you relying on what you were hearing at

4    least during the parts where it was going in and out, or was

5    it -- was the quality of the audio where you could understand

6    what they were saying?

7    **A**     Some of it, yeah.  They were going in and out.  I mean,

8    we also had the visual of them, at least one of us.  One unit

9    had eyes on them at all times.

10   **Q**     And you just -- you're not talking about on the Casper.

11   You mean just through the windows?

12   **A**     Yeah.  I'm just talking -- not counting the Casper.  I'm

13   just talking about as far as vehicles, we would switch off.

14   Like, he may take one vehicle, take the lead one time and then

15   another until we got into Laurens and we could actually switch

16   off with four or five different cars.

17   **Q**     Okay.  Got you.  So at this point how was the video of

18   the Casper working?

19   **A**     That part of the county was actually -- from Spartanburg

20   County it's a rural area and the cell phone service out there

21   is terrible.  So, I mean, it was going in and out bad.

22   Sometimes it will even go out in between Union and Laurens

23   County.  There's places it won't even pick up.

24   **Q**     So there's no video at this point?

25   **A**     No.

1   **Q**     Okay.  So is the CI texting you at this point?

2   **A**     No.

3   **Q**     So you guys are just watching them drive to where they're

4   going to go?

5   **A**     Yes.

6   **Q**     Did you-all have cars that were operational with dash

7   cams?

8   **A**     No.

9   **Q**     So, once they drive and they stop at the gas station,

10  then where is their next stop?

11  **A**     In Laurens County at the Curb Market, I think is what

12  they call it, or whatever the name of that store was.

13  **Q**     And how long were they at the Curb Market?

14  **A**     Not very long.

15  **Q**     Okay.  So how long did it take them to get, if you left

16  at 5:52, about what time did they get to the Curb Market; do

17  you recall?

18  **A**     I don't recall, but it takes probably 30 to 40 minutes to

19  get to Laurens County.  That's if you don't stop.

20  **Q**     Okay.  So looking at -- if we go back and look at these

21  text messages, there's one -- okay.  So at 8:15 there's a text

22  that says they are at the gas station getting gas.  And then

23  it says, "My dot hasn't moved at all."  Where are you guys

24  looking at these dots?

25  **A**     I'm sorry.  Rephrase that?  I didn't hear you.

1   **Q**   I'm just wondering what the technology is when they say

2   the dots haven't moved.  What are the dots on?

3   **A**   I'm not sure.

4   **Q**   And then this might help.  Later, down two messages,

5   Investigator Vinson, you say:  I can hear them but don't have

6   them on mine.

7   **A**   Oh, yeah.  I can hear it -- basically what that is is I

8   didn't have the video.  I could hear the audio but the video

9   went out.

10   **Q**   Okay.  And so when it goes further down the number is

11   identified.  It says, "I do not have the target's location on

12   the map."  What is that?

13   **A**   Okay.  When you got Casper -- when you pull up Casper it

14   also shows you GPS location.  So when two parts of it in the

15   little smaller screen you can actually make the map bigger on

16   the screen, see the picture so it gives you a GPS location and

17   also of the video.

18   **Q**   Okay.  Got you.  So, it says you don't have -- someone

19   doesn't have the target's location on the map.  Was someone

20   able to see them or see the car at all times?

21   **A**   Yes.

22   **Q**   Okay.  So, once they go to the Curb Market, how long were

23   they stopped before they moved again?

24   **A**   Just a few minutes.  Five maybe.  I'll say no more than

25   ten minutes.

1  **Q**    Did anybody go into the Curb Market or did they stay in

2  the car?

3  **A**    Just stayed in the car.

4  **Q**    So where did they go after the Curb Market?

5  **A**    They left there and went to the place where the other

6  guy, the unknown male was, where they purchase the meth from.

7  **Q**    So at this point you've already driven away because you

8  had gotten made.

9  **A**    Yes.  When I was at Curb Market, that was when I was

10  being counter-surveilled and I kind of just, you know, I was

11  probably six, seven miles away at that point.

12  **Q**    So did anyone in law enforcement actually observe the

13  alleged buy?

14  **A**    Yes.

15  **Q**    And who observed the buy?

16  **A**    It was one of the agents, one of the deputies from

17  Laurens County.  They had one car that was in the area that

18  actually could see the vehicle.  I don't know if they could

19  actually see the hand-to-hand in the window.  I can't testify

20  to that.  But they were -- they did have eyes on the vehicle.

21  **Q**    Okay.  So you just testified that there was a

22  hand-to-hand through a window?

23  **A**    I don't know -- I don't know that they -- if there was or

24  not.

25  **Q**    Okay.

1    **A**    I wasn't there, so I don't know.

2    **Q**    Okay.  So your report -- if we can go back to Exhibit 2,

3    Investigator Vinson.  Your report states that Santis and the

4    CI, once they get to this location where the buy allegedly

5    happened, your report says Santis got out of the vehicle and

6    was handed a blue bag with methamphetamine from an unknown

7    black male.  So you didn't observe the buy, correct?

8    **A**    Correct.

9    **Q**    So where does this information come from?

10   **A**    That's just what we had heard over the Casper.  And he

11   actually never got out, to my knowledge.  I could not see that

12   he actually never did get out of the vehicle.  I don't know

13   why I put that in there, but he didn't get out.

14   **Q**    So, have you reviewed the other reports in this case?

15   **A**    You talking about Laurens County?

16   **Q**    Yes.

17   **A**    No, ma'am.  I have not.

18   **Q**    Have you seen the DEA report?

19   **A**    No, ma'am.

20   **Q**    Did you hear this information about Santis getting out

21   and getting a blue bag from anyone else?

22   **A**    Not that I recall.

23   **Q**    And your testimony today is though that you believe he

24   did not get out of the car.

25   **A**    Correct.

1    **Q**    And so what is that based on?

2    **A**    What is that --

3    **Q**    What is your knowledge that he didn't actually get out of

4    the car?

5    **A**    Just going by listening to reviewing when I reviewed the

6    Casper and all, just listening to it.

7    **Q**    So no one from the other agencies told you that he stayed

8    in the car?

9    **A**    No.

10    **Q**    And no one from the agencies told you he got out of the

11    car?

12    **A**    No.

13    **Q**    So, when you say you reviewed the audio and based on your

14    review of the audio, you think he stayed in the car.  Why do

15    you think that?

16    **A**    I just -- to me I never did hear, like, a door open or

17    close.  And I could hear the unknown male.  As soon as they

18    pull up you can actually hear like when the car is moving.

19    It's like really kind of loud.

20    **Q**    Right.  Right.

21    **A**    And then when it stops you can hear better, hear a little

22    bit better.  And so I never heard, like, a door open or a door

23    close.  I just heard the male come up and they started

24    talking.

25    **Q**    So, Investigator Vinson, did you review your report at

53

1   any time before this hearing?

2   **A**   I did.  I read over it, yes.

3   **Q**   Is there a reason why you didn't supplement it to correct

4   that fact?

5   **A**   I didn't do it.

6   **Q**   So, once the alleged buy happens, prior to -- I'm going

7   to go back a little bit before.  Did you guys have a plan

8   about how you were going to get the drugs out of the car?

9   **A**   Not necessarily.  No.  We just said that we would take --

10   our plan was with him driving if they stopped at another

11   location on the way back, then we would do the stop there,

12   whether it was in Laurens, Spartanburg, or Union County,

13   either one.  So, there never was a plan.  Just the plan was

14   her being a CI that we would just take them down and make it

15   look like it was a normal traffic stop.

16   **Q**   And then was part of you-alls plan to search the car

17   incident to arrest?

18   **A**   Rephrase that.  I'm sorry, I couldn't --

19   **Q**   Was it part of you-all's plan to search the car incident

20   to arrest?

21   **A**   Yes.

22   **Q**   So, once they leave, how long are they driving -- they

23   drive all the way back to the CI's house, correct?

24   **A**   Yes.

25   **Q**   And at this point when do you get back into the

1  surveillance or into the surveillance --

2  **A**    The whole time once they started -- once we lost our --

3  or got rid of our countersurveillance, when they started back

4  then we met back up with I think there was, I'm not a hundred

5  percent sure, but I think Laurens County had three and we had

6  two.  One of our vehicles plus SLED.  And we just kind of

7  switched back and forth to who actually, you know, was

8  following the vehicle all the way back into Union.

9  **Q**    So you said there was five cars at this point?

10  **A**    I think there was.  Don't hold that to me.  I think

11  Laurens County had three and we had two.  I know Union County

12  had two.

13  **Q**    Okay.  So could all five cars hear what was on the

14  Casper?

15  **A**    Yes.

16  **Q**    Okay.  So, as you guys are driving you say that when you

17  get back to the CI's house you believe that Santis noticed law

18  enforcement?

19  **A**    Yes.

20  **Q**    And why do you think that?

21  **A**    Because where the road was, the road is -- that's Highway

22  18, and when you go straight down 18, you turn over the

23  railroad tracks and her road or neighborhood, her road where

24  her house is is parallel.  So us having all those vehicles, as

25  soon as he made that turn he could see our car just right

1    across the track.

2    **Q**   I see.

3    **A**   And it was -- it was approximately at that time we had

4    another marked unit so there was maybe six vehicles at that

5    time.  I'm just assuming there's the police behind us.

6    **Q**   So did anyone activate their blue lights?

7    **A**   When they made the traffic stop.

8    **Q**   Okay.  So, on the audio, which you said you reviewed, you

9    could hear Santis say that they're behind him?

10   **A**   Yes.

11   **Q**   And so at that point the traffic, the blue lights are on,

12   correct?

13   **A**   I'm not sure because -- see, I went around the other way.

14   The SLED -- Justin Meeks, the SLED agent and one of my

15   investigators was actually the ones that went right behind

16   them to make the traffic stop.  They actually went out of my

17   sight when I went around behind the back way, that same road.

18   **Q**   Okay.  So did you hear or see the blue lights of the

19   other cars?

20   **A**   Once I pulled up to the car.  I can't see it when I go

21   around that back side of that neighborhood.

22   **Q**   Okay.  Got you.  So you said that you heard Santis and

23   the CI discussing hiding the bag?

24   **A**   Yes.

25   **Q**   That also is not in your report, correct?

1  **A**    Correct.

2  **Q**    And you haven't reviewed the other reports.  Did any of

3  the other law enforcement officers report hearing that they

4  had heard them discussing hiding the bag?

5  **A**    We didn't discuss it so I'm not really sure.  I just know

6  it's on Casper saying -- you know, I can hear her saying, I

7  can't throw it out because they're behind us.

8  **Q**    Who actually initiated the traffic stop of the vehicle?

9  **A**    The Special Agent Meeks with SLED, and also my

10  investigator Reggie Ellison.  Meeks was -- Special Agent Meeks

11  was driving.  It was in his vehicle.

12  **Q**    And they are the ones who actually -- are they the two

13  who also arrested Mr. Santis?

14  **A**    They are the ones that they took them out and detained

15  them and put them in handcuffs.

16  **Q**    Okay.  And the time between when the stop happened and

17  you can hear this on the tape, them telling him to get out,

18  the car hadn't even come to a complete stop yet, correct?

19  **A**    That I don't know because I was coming around the back

20  way.  When I actually pulled up, I think you can see it on my

21  body cam, you can see when I'm getting out of the car he's

22  actually on the ground because they have already got him out

23  of the car.

24  **Q**    The audio -- in the audio tape though you can hear him

25  say, "I had to put it in park", correct?

1    **A**    I don't recall.  I'm not sure.

2    **Q**    So, they -- these other officers, the one from SLED and

3    then your other officer, they basically arrested Mr. Santis

4    immediately after he got out of the car, correct?

5    **A**    They took him out of the car and placed him in handcuffs,

6    correct.

7    **Q**    And they put him on the ground.  All that sort of thing.

8    **A**    Yes.

9    **Q**    And then you showed up after he was already on the

10   ground?

11   **A**    30 seconds.  Yeah.  30 seconds to a minute from when they

12   made the stop.

13   **Q**    So, when you showed up did he get off the ground before

14   you -- he got off the ground and walked to the other side of

15   the car?

16   **A**    Actually, when I got out of the vehicle you can actually

17   see him laying on the ground.  I walked around to the

18   passenger side and kind of briefly looked in and, you know,

19   while I'm doing that they get him up off the ground and take

20   him back to the back side of the truck.

21   **Q**    Okay.  So, did you at any point talk with the other law

22   enforcement that were involved in this operation, the ones

23   from Laurens or any of the other officers who were involved?

24   **A**    I think so.  I think I did.  I recall them asking me if

25   they seen the dope in the car.  They were looking.  Wasn't

1   searching, but they were looking in the doors because both

2   doors were open.

3   **Q**   So they were already searching the car before --

4   **A**   No.  They wasn't searching.  They were just looking in.

5   Just looking in the truck.

6   **Q**   Okay.  And so at that point were the doors of the truck

7   open?

8   **A**   Yes.

9   **Q**   So when did the actual -- who actually did the search of

10  the car?

11  **A**   I want to say it was Investigator Ellison and Meeks.

12  SLED Agent Meeks.  Special Agent Meeks.

13  **Q**   And were you at all involved in the search of the car?

14  **A**   I did at one point when I asked, you know, my CI where

15  the, you know, where the dope was.  And she told me it was,

16  you know, in the seat there.  We actually went in and got the

17  dope and looked in the bag and took pictures of it.

18  **Q**   Okay.  So you're the one who got it from the car?

19  **A**   Yes.

20  **Q**   Or got it out of the truck?

21  **A**   I don't recall if I got it out.  I remember opening the

22  bag up so I could take a picture of it.

23  **Q**   Okay.  Got you.  And so at this point Mr. Santis is just

24  to the left of the car and you-all are searching the car while

25  he's just standing there?

1  **A**    Yes.  I think I've actually -- I think I actually

2  interviewed and talked to him, read him his rights and talked

3  to him behind the car before I went to the vehicle and done

4  that.

5  **Q**    Okay.  On the audio of the officers who were searching

6  the car, do you know which officers those were?

7  **A**    Which officers what?

8  **Q**    That were in the car.

9  **A**    I'm wanting to say there was -- I want to say it was

10  Reggie Ellison that works with us, then Special Agent Meeks.

11  And there was also Dylan Beheler that's on my task force that

12  works for the City of Union.

13  **Q**    So, after Mr. Santis, you then Mirandized him and he gave

14  a statement.  You-all took him back to the task force,

15  correct?

16  **A**    Correct.

17  **Q**    And then you interviewed him, correct?

18  **A**    I didn't actually conduct the interview.

19  **Q**    Okay.  Who conducted the interview?

20  **A**    It would be Nations from Laurens County.

21  **Q**    Okay.  Why did --

22  **A**    I decided at that time since the unknown male was from

23  Laurens that they purchased the meth from, that it would be

24  better for Nations to interview him and try to -- they could

25  figure out who that subject was.

1  **Q**    And do you know how long that interview lasted?

2  **A**    As far as just the interview, who it was or how it took

3  place, I couldn't say.  But he was probably there probably a

4  couple hours total, I mean, but we were talking -- we kind of

5  get a historical little bit on him too about who he could

6  purchase meth from and who he had dealt with before in the

7  past too.  So it wasn't all just about that one controlled

8  buy.

9  **Q**    Okay.  Got you.  So once you-all had interviewed him do

10  you guys get warrants the same day?

11  **A**    By this time it was changed from midnight to the next

12  day.  So that next day, yes, there was actually warrants

13  signed on him.

14  **Q**    And is there a reason that you guys didn't get a warrant

15  on the co-defendant who he had identified as being the source?

16  **A**    No, because it was -- actually he was in Laurens County.

17  It actually took place in Laurens County.  So that was going

18  to be up to Laurens County to do.

19  **Q**    So after you get the warrant, was the CI charged for the

20  drugs that she -- that you had found in the car when you had

21  engaged her?

22  **A**    You talking about the initial earlier in that day?

23  **Q**    Yes.

24  **A**    She was.

25  **Q**    And why was she charged with the drugs?

1  **A**    She didn't fulfill her CI obligation and was continuing

2  to do other narcotics and do other dealings that we had

3  knowledge of.  So I, in turn, signed warrants on her and went

4  back and we arrested her for that later on.

5           **MS. DAVIS:**  Thank you.  I have nothing further.

6           **THE COURT:**  Any redirect?

7           **MS. BALES:**  No, Your Honor.

8           **THE COURT:**  All right.  Investigator, you may step

9  down.  It's tight.

10          All right.  Before we go to your next witness, I

11 want to take a brief recess.  And Ms. Blanchard, Ms. Blanchard

12 and Mr. Garner, I'd like to see you on an unrelated matter,

13 and we'll take about ten minutes and then continue.  We'll be

14 in recess.

15          (Recess taken from 1:19 p.m. until 1:25 p.m.)

16          **THE COURT:**  Thank you.  Please be seated.

17          All right.  Ms. Bales, next witness.

18          **MS. BALES:**  Actually, Your Honor, for the purposes

19 of this particular hearing, we only wanted to be able to move

20 forward with Investigator Vinson.

21          **THE COURT:**  All right.  Ms. Davis, anything from

22 defense?

23          **MS. DAVIS:**  No, sir, Your Honor.

24          **THE COURT:**  Let me hear from you on your motion

25 then.

62

1        **ARGUMENT BY DEFENSE**

2            **MS. DAVIS:** Yes, Judge. So we move to suppress the

3    evidence in this case on two bases. The first is that there

4    was not reasonable suspicion for the stop, and the second is

5    that there wasn't probable cause for the arrest or the search

6    of the vehicle. This case really turns on one thing, and

7    that's what law enforcement knew and when they knew it, and

8    that turns on the reliability of the CI.

9            So, this case is a puzzler because there's a lot

10   that is missing that we don't know. There's a lot in the

11   reports that we don't know. There are inconsistencies in the

12   reports that we don't know. And so even if today's testimony

13   is credible, because we're looking at the totality of the

14   circumstances determining whether law enforcement at the time

15   when they pulled the car over and the blue lights came on had

16   a reasonable suspicion, there are limited facts. Law

17   enforcement didn't see the buy, they didn't see -- they didn't

18   hear the buy. The audio is of very poor quality. If they

19   were listening at the time of the buy actually happening, you

20   can't hear what's going on. No one saw it because of where

21   people were positioned. And even though to whatever they did

22   see there are facts across all the reports, not just in

23   Investigator Vinson's report, that are inaccurate. The report

24   from the DEA which probably relied on Investigator Vinson's

25   report, the report from Laurens County both mention Mr. Santis

1   getting out of the car and getting a blue bag, which we know

2   did not happen based on Investigator Vinson's testimony today.

3   And so when thinking about the stop, we have to think about

4   all the facts that happened up until the stop and whether

5   there was reasonable suspicion.

6           The CI in this case had never been a CI before.

7   Investigator Vinson said they were familiar with her drug

8   history.  She had never been a CI.  And one of the things that

9   the Court looks at is reliability of the CI.  The Fourth

10  Circuit is very clear that when we are trying to determine

11  whether a tip is good or whether there is probable cause, we

12  have to start with the reliability of the CI.  In this case

13  she had just been pulled over where she had drugs in the car.

14  She has a long criminal history, according to Investigator

15  Vinson, dealing drugs, using drugs.  At that time she had said

16  she hadn't used, but there was no investigation into whether

17  she had used that day.  From that point they go to her house

18  where they're there for several hours, and for at least 40

19  minutes there's no record of what happened in the home.

20  Though Investigator Vinson did not recall on the audio, you

21  can hear several times both Mr. Santis and the CI talking

22  about doing a shot.  Mr. Santis asks her for a rig, which is

23  what you use to do a shot of meth.  They talk about two little

24  bags of dope, which she says they're in my -- which we

25  don't -- the government and I do not agree on that, on what

1    was actually said.  But in our interpretation they're talking

2    about two bags of dope that exist in the house.

3          On top of that a third person comes to the home

4    during this time.  And there's actually -- could potentially

5    be another person in the house.  So during all of this time

6    where they're not -- they can't see what's happening.  You can

7    hardly hear what's happening.  She's not staying in contact

8    with him with text enough for them to know what's going on.

9    They really don't have any knowledge of what's happening.  All

10   they can do is rely on her text messages, which the content of

11   her text messages are he's waiting on the call.

12         They also didn't look into the CI's prior

13   relationship with Mr. Santis.  Though they heard that he

14   wanted to stay with her, they didn't ask why did he want to

15   stay with her.  How did you know him.  They didn't look into

16   that.  They did very little investigation into who this person

17   was that they were working with.  And now we know ultimately

18   on the back end decided she hadn't kept up her end of the

19   deal.  So her reliability as far as the tip that she gave

20   about Mr. Santis having these drugs also wasn't correct.  She

21   told law enforcement that she could get the drugs from him.

22   He actually didn't have the drugs.  At that time he was

23   homeless.  He didn't have a car to get the drugs.  He had to

24   call someone else to try and get this deal going, which she

25   had no knowledge of.  And so this was going really almost

1    flying by the seat of our pants trying to get this to go and

2    trying to get this to happen.  I think it's very problematic

3    that we have no independent corroborating information of what

4    happened in the house.  The house wasn't searched, and we have

5    basically a black hole of what was happening.  For all we know

6    at the time -- for all law enforcement knows at the time they

7    pulled over the car, they could have got the drugs from

8    anywhere.  They could have got the drugs from her home.  They

9    could have got the drugs when they went in the store.  They

10   could have gotten the drugs from many places.  And that's

11   because there wasn't any other corroborating information about

12   what she was telling them at the time.  Furthermore, on top of

13   that, if the CI was using at the time it also would go to her

14   credibility -- I mean, to her reliability, and the fact that

15   they're discussing using the drugs.  And we don't know what

16   happens for 40 minutes.  There's a very real possibility that

17   she was using at the time, as was Mr. Santis.

18             So, in thinking about her reliability, we then have

19   to go to the point where the blue lights come on.  At that

20   point once they leave the home, though law enforcement is

21   trying to surveil Mr. Santis and the CI, they can't.

22   Investigator Vinson, the person that testified today, did not

23   see the buy.  He did not hear the buy.  The law enforcement

24   who allegedly saw or heard the buy are not here today to tell

25   us what they saw or heard.  So at this point all we have are

1  the CI text messages, what happened in her home, and this

2  alleged text message that she -- that the buy is done.

3  There's no picture of the drugs at that point.  It's really

4  hard to know what was actually in the car.  They do leave

5  Laurens, but they could have left Laurens because they were

6  unsuccessful.  So at that point because they did not see it or

7  hear it, there's again no corroborating information for a text

8  from a CI they had never worked with and ultimately found to

9  be unreliable as they didn't give her the benefit of the

10  doubt.

11       So, when they pull over the car at that point, the

12  blue lights come on and, yes, you can hear Mr. Santis and the

13  CI discussing the bag.  Because of the issues with Casper

14  though, Investigator Vinson says he heard that.  None of the

15  other law enforcement say they heard that.  They don't say it

16  in their report.  They didn't come to testify today to say

17  they heard that.  And so as far as we know at the time they

18  pulled them over, if they are pulling them over they are

19  probably caught up in the excitement of pulling them over.

20  The blue lights are on.  They are trying to -- the car

21  stopped.  They're trying to get out.  Investigator Vinson was

22  in a completely different place.  He may have been sitting

23  there listening to the tape, but whether or not other law

24  enforcement heard the tape, we just don't know.  And I think

25  that they needed that to get from reasonable suspicion from

1   the stop to get to probable cause.

2          Even if the Court were to find that -- all the facts

3   lead the Court to find that there was reasonable suspicion for

4   them to pull over Mr. Santis, the case law is clear that once

5   you -- reasonable suspicion and probable cause are not the

6   same.  Probable cause is above reasonable suspicion.

7   Something has to happen to corroborate the reasonable

8   suspicion to get you to probable cause.  If when they pulled

9   him over law enforcement had reasonable suspicion, something

10  had to happen between them pulling Mr. Santis over and them

11  arresting him to get to probable cause.  Nothing in this case

12  happened.  Investigator Vinson says he heard this discussion

13  about the bag, but he's not the one that arrested them.  The

14  law enforcement officers that arrested them, we have no idea

15  if they heard anything about the bag.  We do know that they

16  didn't see the buy.  We know the audio wasn't good.  And so if

17  they arrested him based on that at that point there is no

18  probable cause.

19          Probable cause is based on known facts.  And here

20  your -- the Court's determination is based on the totality of

21  the circumstances.  Everything that we do know weighs on one

22  side.  And so what we know is that we had a CI texting law

23  enforcement saying we left the house.  The buy is done.  Those

24  are essentially everything that they had from the CI.  What we

25  don't know is what happened in the house.  We know that the

1  reports are not accurate, which means the testimony and what's

2  in the reports is probably not accurate.  If you have a fact

3  in the report about a blue bag and someone getting out, these

4  are very specific facts.  The fact that those are in the

5  report and that didn't happen, call into question everything

6  that law enforcement knew.  And it calls into question any

7  report they had about seeing the buy.  And so if that's the

8  case, then there can't be probable cause in this case to

9  arrest Mr. Santis.  And if there's reasonable suspicion it's

10  barely reasonable suspicion.  What we have here is a hunch

11  based on what they had at the time, because of miss -- because

12  of the CI's history, because of Mr. Santis' history, because

13  of the little bits and pieces that they did hear, yes, they

14  thought maybe there might be drugs in the car, but they had no

15  independent corroborating information.

16          The Fourth Amendment is taut with tension.  It has

17  several exceptions which we are probably most familiar with.

18  We're not even in an exception case here.  We're just talking

19  about reasonableness.  And that's the touchstone of the Fourth

20  Amendment is whether it's reasonable in this case being

21  stopped and this arrest.  And because of the lack of

22  information, because of law enforcement leaving things out,

23  because of the audio that was happening at the time, because

24  they didn't actually see the buy, we don't think it's

25  reasonable in this case.

1          And I would like to just quickly go through some of

2     the cases that the government cited.  So they cite the *Draper*

3     case as a case talking about having similar facts to this

4     case.  In the *Draper* case law enforcement surveilled the

5     defendant for six months.  They did small transactions for six

6     months getting information, and that's how they knew the CI

7     was reliable.  In this case they didn't even know the CI.  In

8     the case -- in the Miller case -- I want to make sure I get

9     the facts right.  In the Miller case where they didn't know

10    the CI -- they did not know the CI -- I'm sorry.  If you'll

11    give me one second.

12          So in the Miller case where they didn't know the CI,

13    law enforcement was able to independently corroborate what the

14    CI told them because they saw the defendant -- they saw the

15    defendant get out.  The defendant was wearing what the CI told

16    them he would be wearing.  He was where the defendant -- the

17    defendant was where the CI told law enforcement that the

18    defendant would be, and the defendant had a plastic bag like

19    the CI told him they would have the drugs.

20          The government also relies on two other cases that I

21    would like to distinguish in their argument about there being

22    probable cause.  In the *United States versus Harris* case,

23    which is, again, a Fourth Circuit case.  The informant

24    recently said that she had recently observed cocaine and money

25    inside the defendant's apartment.  There was no such

1   observation in this case.  While the defendant said -- well,

2   the CI said she was familiar with the defendant dealing drugs

3   before.  There was no report from the CI that she had seen

4   Mr. Santis recently deal drugs or have any drugs in his

5   possession.  In fact, she said that he was homeless.  In that

6   case again, officers observed the defendant exit his

7   residence, and he was in a vehicle matching the informant's

8   description.  There's no such corroboration in this case.  He

9   was in her vehicle.  There's nothing that the officers

10  observed on their own apart from the CI.

11          And then in the last case the government cites in

12  the *United States versus Lawing*.  That's where the Court says

13  informants who report tips face-to-face are more trustworthy

14  and reliable than anonymous tips.  And the Court in that case

15  held that they had reasonable suspicion.  This might look like

16  a face-to-face case, but it's not.  And part of the reason is

17  because we cannot corroborate what is happening.  Basically

18  what the government has in this case are text messages that

19  law enforcement didn't even preserve.  That could have been

20  the corroborating information if we had those text messages,

21  if we were able to match them up with the tape, if we were

22  able to match them up with anything, then maybe we could

23  corroborate.  But there is nothing.  There is no face-to-face.

24  What she is saying, there's no independent viewing of.  Even

25  if she told them the deal was done, no one saw that the deal

1  was done.  So there was no way to corroborate what was

2  actually happening.  And so in this case we think it's

3  unreasonable to find that, one, there's definitely no probable

4  cause to arrest Mr. Santis immediately after they pulled him

5  over.  If there's anything in this case, there may be

6  reasonable suspicion to pull the car -- to pull the truck

7  over.  But law enforcement would have needed to do something

8  after that to develop probable cause.  And in this case they

9  did not.  And so on that basis we're requesting that the Court

10  suppress all of the evidence in this case.

11        **THE COURT:**  All right.  Ms. Bales.

12              **ARGUMENT BY THE PLAINTIFF**

13        **MS. BALES:**  Thank you, Your Honor.  Your Honor, the

14  Fourth Amendment does not require perfection.  Only that we're

15  able to evidence -- only that we're able to evidence that

16  there was probable cause, which is defined as a fair

17  probability.  So in this instant case, Your Honor, we're

18  dealing with a situation where it's warrantless.  So there's

19  no warrant in order to stop this vehicle, to arrest the

20  defendant nor to search.  And Your Honor, that's not required

21  in this -- especially in these circumstances.

22        So first off for a warrantless search more often in

23  situations like this, what you're looking at is you're looking

24  at the reliability of the witness -- or of the witness or the

25  CS, if you will, and then you couple that with corroboration

1    in order to make the determination of what law enforcement

2    knew and believed at the time that the vehicle was stopped the

3    defendant was arrested and it was searched.  Here we have the

4    witness, Investigator Vinson, testifying exactly that.

5          As to reliability, Your Honor, we have testimony

6    from Investigator Vinson where she was being candid and

7    admitted that she would snort the methamphetamine, that that

8    was the way that she would ingest it.  She candidly told

9    him that she sold drugs as well.  That she knew of the

10   defendant Mr. Santis.  And that even though she may have only

11   purchased certain quantities, specifically she observed him on

12   previous occasions possessing much larger quantities and

13   believed that she would be able to get those quantities.

14   Investigator Vinson didn't simply rely on that statement.  He

15   did -- he corroborated it.  He reached out to law enforcement

16   in Laurens in order to try to get a better understanding of

17   Santis, and they confirmed that they knew Santis was connected

18   to drug selling.

19         And so in so corroborating they made the

20   determination to go after -- to target Mr. Santis as the

21   person that was dealing or could very likely deal a pound of

22   meth.  They were present and could hear the phone calls

23   between the CS and Mr. Santis.  Again, not just taking the CS

24   at her word, but doing their due diligence and corroborating

25   that very evidence.  So, in listening they heard that there

1   was, in fact, drug talk, that they were very clearly setting

2   up this buy.  They understood that the purpose of their

3   exchange was that initially the plan was that she would --

4   that the CS would pick up Mr. Santis, and that they together

5   would go and get the drugs from his supplier.  So, that was

6   the original plan.

7          Now, due to circumstances beyond the CS's control,

8   Mr. Santis changed the plan up.  So the law enforcement did

9   everything they could to continue thereafter in corroborating.

10  They maintained surveillance of the vehicle.  Yes, they went

11  into the house trying to wait until they could determine where

12  exactly they were going to travel, but they maintained

13  surveillance of the residence as well.  The CS was in

14  communication and confirmed that they were waiting to hear

15  back from Santis' source of supply, whether or not they were

16  going to be going to Newberry, whether or not they were going

17  to be going to that supply in Laurens.  And when she knew she

18  contacted law enforcement.  She text messaged law enforcement,

19  according to Investigator Vinson's testimony, and said that

20  they were on the way, that they were going to Laurens.  So,

21  again, law enforcement was able to corroborate the information

22  that the CS provided by observing that they quickly stopped to

23  get gas, but then they went, in fact, to Laurens.

24         And then from Laurens you heard -- you actually

25  heard the testimony from Investigator Vinson that he could

74

1    hear this third male -- this third party male speaking with

2    Santis and could hear -- yes, it wasn't great audio, but he

3    was able to hear that they were having a conversation.  So,

4    from that it sounds as though they were conducting some sort

5    of business.  But Your Honor, all the way up to this point we

6    have the corroboration from the CS saying what it is --

7    confirming that Santis is, in fact, a worthy target as a drug

8    dealer because he, in fact, agreed to set up this buy and

9    broker it at the very least.  When she said that they were

10   headed to Laurens, law enforcement corroborated that because

11   they personally observed it.  So the case law doesn't, Your

12   Honor, require that every aspect of it must be corroborated.

13   Instead, it's the reliability plus the corroboration if that

14   is enough to then be a basis to believe what it is that they

15   personally couldn't observe.

16          In this case and similar to many of the other cases

17   I cited in my response, law enforcement never actually saw the

18   deal.  Never actually saw the drugs in hand.  Never actually

19   saw a transaction, and instead took what information the CS

20   provided, corroborated that information just as we have in

21   this case.  And then from there the only missing piece, if you

22   will, was whether or not the buy had occurred, if they had

23   anything else that would make them believe or had a basis for

24   the belief that a drug transaction had occurred and that drugs

25   would be in that vehicle.  And Your Honor, here, arguably,

1    it's three ways.  We were -- Investigator Vinson testified

2    that he could hear that Santis was talking to an unknown third

3    party male, and that they were discussing going back and

4    forth.  I believe even mentioned something about the finances

5    and how they were paying for it.  Then you're able to hear or

6    then the CS text messaged Investigator Vinson, and then

7    actually one of the other investigators sent out in their text

8    message chain that the deal was done.

9           So, case law does not require that every aspect of

10   the transaction be observed.  In fact, in one of the cases all

11   they went by was they confirmed that someone was showing up

12   on -- or from a train and would appear on one of two dates,

13   and that that person was a drug mule, and that that particular

14   person in that case was going to have drugs on their person

15   and that they would also have a satchel.  All right.  So when

16   law enforcement arrived in that case, they observed someone

17   matching that description.  They observed them of course at

18   that time window that that particular witness supplied.  Yes,

19   all of that was corroborated from the law enforcement's

20   personal observations.  But, again, in that case they never

21   observed drugs or anything that would on the outward

22   appearance would scream that here very clearly in plain view

23   there are drugs.  And instead they were able to immediately

24   stop that person and place them under arrest and search their

25   purse.  And that's -- or actually it was I think in her hand,

1   it was a newspaper that had been wrapped around a plastic bag

2   that contained the drugs.

3         So in this case, Your Honor, it's a direct parallel.

4   We have law enforcement that corroborated everything that the

5   CS was saying, Santis is a drug dealer.  Santis is going to

6   help coordinate a drug buy.  We're going to Laurens.  They

7   went to Laurens.  Investigator Vinson could hear that some

8   conversation was going forward between this unknown third

9   male.  We get a confirmation text from the CS.

10        Your Honor, it's the government's position that the

11  moment -- at the very least the moment that law enforcement

12  received that text message confirmation that the drug -- that

13  the dope deal had happened, that they had probable cause to

14  believe that there was going to be methamphetamine or dope in

15  that truck.  So, they had free range then to stop the vehicle

16  at any point in time thereafter.

17        Now, you heard, Your Honor, or as Your Honor heard,

18  Investigator Vinson explained why they stopped the vehicle

19  when they did.  They stopped the vehicle because they knew

20  where it was going to return to.  So they thought that they

21  would be able to contain the situation by waiting until that

22  time.  Again, they could have stopped at any point though,

23  Your Honor.

24        Now, here -- beg the Court's indulgence.  So, just

25  in closing, if you will, Your Honor, it's not simply that they

1    solely relied upon the CS.  Instead, it was they took the CS's

2    information, corroborated what they could, and according to

3    the case law in drawing the parallel to the case law, they did

4    more than enough to sufficiently have a basis to believe.

5    They believed that at the time that they were -- that

6    Investigator Vinson rejoined the surveillance of the truck

7    after the buy, that the buy had successfully occurred, and

8    that there were going to be drugs in that vehicle.

9         And then, Your Honor, even if you didn't -- if the

10   Court did not believe that probable cause existed at that

11   point in time, it's the government's position that it

12   certainly -- there was certainly at least reasonable suspicion

13   to stop the vehicle to believe that here we knew that the

14   truck, the sole purpose for that truck traveling over into

15   Laurens was to conduct this drug transaction.  So, all of the

16   information that CS had provided, all of the information that

17   they were able to corroborate independently from either

18   listening or observing through surveillance at the very least

19   established reasonable suspicion to believe that the truck had

20   been involved in an illegal drug transaction.

21        So they conducted -- so they conducted the stop.

22   And as you heard Investigator Vinson testify, he's still

23   listening to the Casper system, and he's able to hear that

24   the -- specifically that Santis and the CS are discussing

25   where to hide the bag.  And at one point as you can hear from

1     the audio, the CS says I can't throw it out.  If I do, law

2     enforcement will see.  I can't even shove it down to hide it.

3     So, Your Honor, at the very least, then the government's

4     position is that we believe that that reasonable suspicion to

5     just conduct the stop matured into probable cause, because

6     here we have where law enforcement is able to hear that

7     they're trying to cover up contraband, that they're trying to

8     hide something from law enforcement specifically, and they

9     don't want law enforcement to see.  So, again, Your Honor,

10    first and foremost it's the government's position that we do

11    have probable cause.  We have probable cause at the moment

12    that that text message was sent.

13          THE COURT:  All right.  Let me ask you this.  And

14    I'm referring to Exhibit 2, the narrative report from

15    Investigator Vinson.  And in that first paragraph there he

16    talks about a recorded -- it says on the recorded call,

17    "Santis stated he could do a deal but the CI would have to

18    drive him to an unknown location.  Santis wouldn't tell the CI

19    where the location would be on the phone."  And then it goes

20    on about, "Ellison searches her vehicle" and all that.  This

21    recorded conversation with Santis, was this done while the CI

22    was in custody?  Was this done in the presence of law

23    enforcement?

24          MS. BALES:  Your Honor, I think there may be a

25    little bit of confusion.  This recorded call, all of the calls

79

1   between the CS and Santis scheduling and preparing this drug

2   buy and drug purchase, that occurred within law enforcement's

3   view.  Like, they were there.  They -- I believe --

4   Investigator Vinson was --

5           **THE COURT:**  That's my question.  When this call was

6   made by the CS to Santis to try to set this up initially, my

7   understanding was that that was done while she was still in

8   custody at the task force office or wherever.

9           **MS. BALES:**  Yes, Your Honor.

10          **THE COURT:**  Before she returned to her home where

11  she met up with Santis.

12          **MS. BALES:**  Correct, Your Honor.

13          **THE COURT:**  So that was done in the presence of law

14  enforcement?

15          **MS. BALES:**  Correct, Your Honor.

16          **THE COURT:**  Okay.  When it says it's recorded, was

17  law enforcement able to hear Santis' end of the conversation?

18          **MS. BALES:**  Yes, Your Honor.  I believe what

19  Investigator Vinson testified was that any time she

20  communicated with Mr. Santis, that she had it on speakerphone.

21          **THE COURT:**  Yeah.  And I know that then we get into

22  later on when they're talking directly and it's on the Casper

23  system and it's in and out and all that, but this part here

24  was in the presence of law enforcement, correct?

25          **MS. BALES:**  Yes, Your Honor.

1      **THE COURT:** Okay. Anything else?

2      **MS. BALES:** No, Your Honor.

3      **THE COURT:** Ms. Davis?

4              **FURTHER ARGUMENT BY THE DEFENSE**

5      **MS. DAVIS:** Yes, Judge. Briefly, Your Honor.

6      Regarding the government's argument that this case

7  is similar to the cases cited in their brief, we want to push

8  back on that. In all of those cases there's something else

9  that happens after the buy has occurred. So, for example, in

10  the *Lawing* case, which I think is the one they rely most on

11  because they didn't know that informant, they didn't see the

12  purchase. In that case when the defendant was stopped, he

13  gave law enforcement a license that didn't have the name that

14  the CI said was on it. After that officers took the CI, took

15  the defendant's phone and called the number to confirm that it

16  was him. So, in this case we don't have that extra step.

17  They don't have that extra step because they stopped the buy

18  before they could get any corroborating information.

19      Law enforcement and the government has a very clear

20  path when it comes to controlled buys. They do them all the

21  time. They're one of their major tools for investigating.

22  They know how to work. They know how they work. They know

23  how to do them correctly. You record the CI, let them go get

24  the drugs, let the CI come back, get the drugs, they

25  corroborate everything that happens. In this case they didn't

1   do it when they had all these other issues in the case.  The

2   fact that the government put out for there being probable

3   cause that there was drug talk, there was.  That they went to

4   Laurens, they did.  That they talked to an unknown third male

5   at the place where they say the buy happened, they talked to

6   an unknown third male at their home for quite some time and

7   then they never saw a drug transaction or deal in hand, but

8   they don't think they need that.  Maybe they wouldn't need

9   that in a case where the CI wasn't talking about doing drugs

10  in her home.  In a case where the CI could go back to the

11  house that wasn't searched.  In a case where the CI was at her

12  home for over two hours.  In a case where the report would

13  reflect what actually happened.  Maybe you wouldn't need to

14  see the buy or have the drugs in hand.  But because they

15  didn't in this case, they need those other circumstances to

16  get to a totality.

17          And just the last point I want to push back on as

18  well is even if Investigator Vinson heard them talking about

19  the bag when they were in the car, he's not the one who did

20  the arrest.  The government has made no argument that that

21  knowledge that he had is attributable to the other law

22  enforcement officers.  And they don't mention hearing about

23  the bag.  They don't mention it in their reports.  And no one

24  here today came to testify.  And so if that's what's getting

25  them to probable cause, the person who heard that isn't the

1   person who affected the arrest, and therefore the only

2   information that law enforcement was acting on as far as we

3   know who actually did the arrest for what they could hear on

4   this audio prior to time, which as we saw today the quality of

5   that audio is not good.  And so at that point they were deaf.

6   They were blind.  There was no way for them to know if a deal

7   had actually happened.  They arrested Mr. Santis based on a

8   hunch.  Yes, they're going to come back and say, we're right.

9   But that is not information that can be used to corroborate.

10  It's what they knew when they pulled them over and what they

11  knew when they put him in cuffs.  And we think at that time

12  they didn't have probable cause.

13          **THE COURT:**  The text it says the deal was done.  Was

14  that a text from the CI?

15          **MS. DAVIS:**  No.  So Investigator Vinson says the CI

16  did text him that the deal was done.  The text that was --

17  those were texts from law enforcement.

18          **THE COURT:**  That's what I was thinking.

19          **MS. DAVIS:**  Yes.  And then of course today though, I

20  would say based on Investigator Vinson's testimony, no one

21  actually -- he didn't see --

22          **THE COURT:**  Well, he didn't see him.

23          **MS. DAVIS:**  Right.

24          **THE COURT:**  All right.  Ms. Bales.

25          **MS. BALES:**  Just --

1            **THE COURT:**  Just on that point.

2              **FURTHER ARGUMENT BY THE PLAINTIFF**

3           **MS. BALES:**  Sorry, I know.  But very briefly, what's

4    known by one officer is impugned to the other.  They know they

5    were on the system.  And Your Honor, one of the things that it

6    seems like defense counsel is really arguing about is not just

7    so much a reliability issue, she's attacking credibility.  And

8    I think that credibility is more of an issue, Your Honor, for

9    trial.  But as far as the totality of the circumstances go

10   here, I mean, law enforcement is not required to have a set

11   form for how they do controlled buys.  In this case it's

12   different.  But here though we do have so much more that we

13   are able -- that law enforcement was able to do and

14   corroborate in addition to what they had from the CS.  So Your

15   Honor, from everything that they knew at the time, law

16   enforcement believed that they were dealing with a reliable CS

17   who had a reason to be reliable or -- to be reliable because

18   she was facing a charge.

19          **THE COURT:**  Well, she had a reason to deliver drugs

20   to them because they gave her a way out when she got caught

21   with some.  Here's what I think you're dealing with, and I

22   think there are two issues.  The reasonable suspicion part, I

23   think that's an easy call.  I mean, they're dealing with an

24   informant who calls the defendant in their presence.  They

25   hear through a recorded call her and the defendant talking

1    about setting up a buy, and the defendant is talking about

2    that he's going to need her to drive him because they're going

3    to have to do it at another location but he won't tell her

4    where.  Then they quibble with this extra cell phone.  Why

5    they didn't use just a good old-fashioned wire, I don't know.

6    But they equip her with this cell phone and send her off and

7    they keep her under surveillance.  She meets him at her house.

8    They're there for a long time.  Their information is that he's

9    got a source of supply either in Laurens or Newberry, and they

10   end up going to Laurens.  They get a text from her saying the

11   deal is done.  They have information even though, you know,

12   making out exactly what was said and what exactly transpired

13   based on the evidence before me today is an iffy proposition.

14   But they have information that they met a third party.  And

15   after that meeting they get the text saying that the deal is

16   done.  They follow them back to Union County.  It's a

17   Union County investigation.  And when they see that they're

18   going back to her house before they -- she gets to the house,

19   they initiate the stop.  Now, I think there's at least

20   reasonable suspicion.  I think there very well may be probable

21   cause.

22            So I'm not sure how we're going to come out on this.

23   I want to go back and look at your submissions.  I want to

24   look at the cases again about reliability of the confidential

25   informant because I think that is an issue in this case given

85

1   the fact she hadn't been used before, and the fact that, you

2   know, law enforcement has in pretty much any of these cases,

3   they gave her a motivation to deliver what they were looking

4   for because that's how they were indicating she might help

5   herself on the drugs she got caught with.

6           I think the most troubling part of this to me is

7   that regardless of how the suppression hearing comes out,

8   there's reasonable doubt you could drive a truck through in

9   this case because there's all kinds of things that could have

10  happened.  There's a plausible theory the defense could make

11  that because law enforcement was blind as to what was going on

12  inside this house, this CI who's trying to get out of drugs

13  charges could have had a bag of dope in her house.  They get

14  back in the car and they just make a trip to Laurens, come

15  back, and voila, she's got the defendant in the vehicle and

16  she's got the dope when they search the vehicle.  Yeah,

17  there's credibility issues.

18          And so I would simply suggest to you that while the

19  government may meet the bar on the probable cause and get past

20  this motion to suppress, you know, I understand where the

21  defense is coming from.  And there are -- there's a lot of

22  issues here, because the quality of the audio, we can't really

23  trace exactly what happened because it's in and out and

24  whatnot.  We know what the plan was.  We know what the CI said

25  she was doing and was going to happen.  I think it's

1   problematic to defendant that this first call takes place

2   while she's still in the presence of law enforcement.  And so

3   they know she's talking to Santis, or at least has reason to

4   believe that she's talking to Santis and he's indicating he

5   could set up a buy.  But then once they get to her house, I

6   think that law enforcement is going to have to acknowledge

7   that while they're in that house they are pretty much blind as

8   to what's going on, and they're depending on that CI and her

9   reliability and credibility pretty much from there on out.

10          So, for what it's worth, Ms. Davis, I see where

11  you're coming from.  I don't know that it's going to get you

12  where you're trying to go, but I do understand the defense

13  theory here.

14          I'm going to take this under advisement.  I do want

15  to look at the case law.  I think I've got a pretty good idea

16  of the facts based on what you've laid out through

17  Investigator Vinson's testimony and the exhibits.

18          Let me ask you this, in light of the poor quality of

19  the audio, Ms. Bales, I understand that the government does

20  not concede the defense's interpretation of what's on the

21  audio.  What's the government's position about whether the

22  audio is all that important anyway?

23          **MS. BALES:**  Well, Your Honor, I think the audio is

24  pretty important.  And what I guess I need to clarify for the

25  Court is that we're trying to coordinate with DEA's, I guess,

1    more technical aspects of DEA to obtain a clear version of the

2    audio.  Of course it wasn't particularly relevant for today

3    because we were needing to rely on what it is law enforcement

4    could hear.

5              **THE COURT:**  And that's why I'm asking.

6              **MS. BALES:**  Certainly.

7              **THE COURT:**  Based upon what law enforcement knew.

8              **MS. BALES:**  Right.

9              **THE COURT:**  And the chain of events and how that

10   plays into the totality of the circumstances.

11             **MS. BALES:**  Right.

12             **THE COURT:**  The specific statement that may be

13   intelligible or unintelligible, what's the government's

14   position on how important it is with respect to the

15   establishment of the proximate cause?

16             **MS. BALES:**  I'm sorry as to what being?

17             **THE COURT:**  The audio --

18             **MS. BALES:**  Oh, the audio.

19             **THE COURT:**  -- that was being monitored.

20             **MS. BALES:**  Right.  I think the audio really more

21   along the lines assists with providing the timeline of

22   events, and then also provides corroboration as to

23   Investigator Vinson's understanding of what it was that he was

24   able to hear between the third party.

25             **THE COURT:**  I've got his testimony about that.

1       **MS. BALES:**  Right.  Yes.

2       **THE COURT:**  You know, he couldn't hear much.  He

3  could hear them discussing the cash and some things in and

4  out, but...

5       **MS. BALES:**  Right.

6       **THE COURT:**  But that was about it.  But, I mean,

7  beyond what he's testified to here today, what I'm trying to

8  determine is since you don't agree with their transcript of

9  what's on the audio --

10       **MS. BALES:**  Right.

11       **THE COURT:**  -- is there any particular part of that

12  audio that you believe is critical for me to try to listen to

13  and discern what they're saying?

14       **MS. BALES:**  As to that, Your Honor, no.  I do not

15  believe so.  For the purposes of the transcript, no.

16       **THE COURT:**  Okay.  And Ms. Davis, likewise for

17  purposes of this hearing, the transcript was not admitted.  I

18  was not asked to rule on that so it's not in.  You did put the

19  audio itself in, but after a couple of tries it became

20  apparent that that wasn't going to be particularly helpful.

21  From the defense side from the standpoint of your motion, is

22  there any part of that audio that you believe is critical for

23  the Court to review?

24       **MS. DAVIS:**  Well, Judge, that's a great question.

25  Critical?  I think it's helpful.

89

1          **THE COURT:** A lot of what you're talking about is

2    what I might could hear about what they were doing at the

3    house?

4          **MS. DAVIS:** Right.

5          **THE COURT:** Well, if we -- if we assume for the sake

6    of argument that they were there for, I believe,

7    Inspector Vinson -- Investigator Vinson stated the better part

8    of two hours and that, you know, there was no video or audio

9    that was easy to see or hear --

10         **MS. DAVIS:** Right. Right.

11         **THE COURT:** -- inside that house, they were

12   essentially blind inside that house. Is there anything in

13   particular that you believe is on the tape that would be

14   critical for the Court's decision?

15         **MS. DAVIS:** I don't think so. I think to the extent

16   that both the government and I have offered interpretations in

17   our motions, that that would be our interpretation of what's

18   going on at those particular times in the audio.

19         **THE COURT:** Okay. All right. Well, here's what I'm

20   going to do. I'm going to give each of you till next

21   Wednesday, which I believe would be the 19th. I think

22   tomorrow is the -- no, the 21st. I'm sorry. Because tomorrow

23   is the 14th. I'm going to give you to the 21st based upon

24   what transpired this morning if you want to submit anything to

25   supplement what you've previously submitted. And then after

1    that I'll take a look at it and I'll get you a decision as

2    quickly as possible.

3             **MS. BALES:**  Certainly.

4             **THE COURT:**  All right.  Ms. Bales, anything else

5    from the government today?

6             **MS. BALES:**  No, Your Honor.

7             **THE COURT:**  Ms. Davis, anything else from defense?

8             **MS. DAVIS:**  Nothing further, Your Honor.

9             **THE COURT:**  All right.  Thank you, very much.  That

10   will conclude this matter.

11        (Court adjourned at 2:08 p.m.)

12

13   * Proceedings recorded by mechanical stenography,
     transcript produced by computer.

14

15

16                      CERTIFICATE

17        I,  Michele E. Becker, certify that the foregoing is

18        a correct transcript from the record of proceedings

19        in the above-entitled matter.

20

21   /s/  Michele E. Becker              Date:  06/16/2023

22

23

24

25

                    Michele Becker, RMR, CRR, RPR
                         US District Court
                     District of South Carolina